JOHNNIE M. JACKSON, JR. *v.* DEBORAH S. JACKSON
(2694)

DANNEHY, C.P.J., DUPONT and HULL, Js.

Argued February 3—decision released June 19, 1984

*David S. Maclay,* for the appellant (defendant).

*Lawrence P. Weisman,* with whom, on the brief, was *Ellen B. Lubell,* for the appellee (plaintiff).

HULL, J. The defendant appeals[1] from the trial court's denial of a motion to open or to reform a judgment dissolving the parties' marriage, claiming that the stipulation on which the judgment was based was the result of fraud, accident or mistake.

The judgment dissolving the marriage was rendered on December 12, 1980, based on the written stipulation of the parties. The stipulation provided in significant part as follows: (1) that the plaintiff would transfer to the defendant 2100 shares of stock in C 3, Inc., by December 31, 1980; (2) that the proceeds of the sale of the parties' former residence should be divided evenly between the parties; (3) that the plaintiff husband would pay to the defendant wife $13,200 in periodic alimony terminating on September 30, 1982.

On March 10, 1981, the defendant, through new counsel, filed a motion to open or to reform the judgment of dissolution, the denial of which motion by the court

---

[1] This appeal, originally filed in the Supreme Court, was transferred to this court. Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (c).

is the basis of this appeal.[2] To put the fundamental issue simply, the defendant claims that she and her lawyer thought they were getting slightly less than half of the plaintiff's 4277 shares of stock in C 3, Inc., when, in fact, as known by the plaintiff but unknown by them at the time the stipulation was entered into, the stock had split three for one during the negotiations resulting in the plaintiff's owning 12,831 shares. As a result, the defendant got approximately one sixth of the stock, rather than almost one half, and the plaintiff got five sixths of the stock rather than just over one half. The defendant's 2100 shares were sold in February, 1981, for $67,200; therefore, the disparity in the division of the stock is very substantial.

---

[2] The defendant's motion provided as follows:

"MOTION TO CLARIFY OR REFORM, OR TO REOPEN OR REFORM JUDGMENT

"Pursuant to G.S. § 52-212a and the equitable powers of this Court, the defendant respectfully moves that the financial and property provisions of the Judgment of this Court entered December 12, 1980 be clarified or reformed or reopened and reformed.

"The Judgment entered on said date was based upon a Stipulation dated December 12, 1980, which called upon the plaintiff to transfer to the defendant 2,100 shares of the capital stock of C-3, Inc., a Maryland corporation.

"Said Judgment and said Stipulation were based on the plaintiff's representation and the defendant's understanding that the plaintiff owned a total of 4,277 shares of said stock and that it was being divided between the parties, approximately 50% to each. The defendant relied on such representations and the plaintiff's failure to disclose otherwise.

"The plaintiff knew, but failed to disclose to the defendant, that while they were conducting the negotiations which resulted in said Stipulation, said C-3, Inc. stock, which was not publicly listed at that time, had been split three shares for one so that the plaintiff actually owned 12,831 shares on December 12, 1980.

"On his final affidavit dated December 11, 1980, the plaintiff showed that his total holdings of said stock had a value of $6,415.50 whereas, unknown to the defendant, its true value was in excess of $400,000.

"The plaintiff has failed and refused to transfer to the defendant 2,100 shares of the pre-split original shares.

"As a result of said fraud on the Court and the defendant, the plaintiff is estopped from denying that the 2,100 shares mentioned in said Stipulation and order were original pre-split shares, and the plaintiff is estopped from asserting that the reference was to 2,100 post-split shares.

"Said circumstances constitute fraud, accident and mistake in the procure-

The defendant briefed three major issues as follows: Where the defendant wife agreed in a marriage settlement to accept an amount of stock which she mistakenly thought was fifty percent of the plaintiff husband's substantial holding in that stock, and where it actually was only sixteen percent of his holding because of a recent three-for-one stock split received by the plaintiff husband but not disclosed to her: (1) was the plaintiff husband required to disclose the true facts where he was at all times fully aware of her mistake; (2) was the defendant wife entitled to equitable relief; or (3) was she barred by her own failure to find out about the stock split which her husband had deliberately concealed from her?[3]

The trial court applied the four pronged test outlined in *Varley* v. *Varley,* 180 Conn. 1, 4, 428 A.2d 317 (1980), as follows: the relief of vacating a judgment based on fraud will be granted only if (1) there has been no laches or unreasonable delay by the injured party after the fraud was discovered; (2) there must have been a diligent effort made in the original action to discover and expose the fraud; (3) there must be clear proof of the fraud; and (4) there must be a substantial likelihood that the result of the new trial will be different. The court concluded that previous counsel had all the necessary information concerning the financial status of the C 3,

ment of said Stipulation and judgment.

"Wherefore, the defendant respectfully requests: 1. That the Judgment be clarified or reformed to show said reference is to 2,100 shares of C-3, Inc. stock as the shares existed prior to said three for one stock split. 2. In the alternative, that this Judgment be reopened and reformed as aforesaid. 3. In the alternative, that the Judgment be reopened and for such further relief as justice may require. 4. That the defendant be awarded reasonable attorney's fees and her expenses in connection with this motion."

[3] The plaintiff also briefed a separate issue with respect to the plaintiff's claiming the attorney-client privilege at the hearing to open the judgment of dissolution to bar evidence of his conversations with his attorney concerning the stock split. In view of our disposition of this case we do not consider this issue.

Inc., stock available to him at the time he counselled the defendant to agree to the terms of the settlement. The court further found that counsel's failure to secure a more advantageous agreement can be attributed only to his own inadvertence and not to any act or omission of opposing counsel or the plaintiff. It pointed out that during the trial on the motion to open the judgment of dissolution, the defendant's trial counsel specifically stipulated that if he had read the prospectus concerning the C 3, Inc., stock going public and had noted the information concerning the stock split, "we wouldn't be here today." The court finally found lack of due diligence on the defendant's part and "absolutely no evidence of any fraud, deception or mistake." The trial court, during proceedings on the plaintiff's motion for rectification, found that the defendant knew, or should have known, based on the information that was available to her and to her attorney, that the C 3, Inc. stock had split three for one.

"Every cause will have its own peculiar complexion and leading cast." *Stoddard* v. *Bird,* 1 Kirby 65, 69 (1786). Under the circumstances of this case, in the context of relatively amiable negotiations leading to a stipulation and an uncontested judgment of dissolution, we conclude that the plaintiff took unconscionably fraudulent advantage of the defendant's ignorance of the three-for-one stock split, resulting in a substantial injustice. Therefore, we reverse the judgment of the trial court.

The underlying facts are not in dispute. The parties to this action were married on June 22, 1968. No children were born of the marriage. Both parties worked during the marriage, the plaintiff as an attorney and the defendant as a school teacher. At the time of the dissolution action, the plaintiff was employed as an attorney at the Olin Corporation. The defendant had attended law school briefly but withdrew in Septem-

ber, 1980. The plaintiff instituted an action for dissolution of marriage on May 20, 1980. Both parties were represented by counsel. In the summer of 1980, counsel commenced negotiations concerning a property settlement. At the start of negotiations on June 26, 1980, the plaintiff's attorney sent to the defendant's attorney the plaintiff's financial statement. It showed modest assets totalling $41,223 including the plaintiff's one half interest in the Stamford real estate. It also included: "Securities: 4277 shares C-3, Inc. @ $1.50 (note: this is lettered investment stock for which there is no real market) (basis = $10 per share net after federal and state taxes) $4499.44."[4] C 3, Inc., was a privately held unlisted company in the computer software business.

The parties themselves worked out a division of the major items of personal property by August 1980. They agreed upon a written stipulation dated October 29, 1980, which gave the defendant 60 percent of the proceeds from the sale of the home, 60 percent of an agreed upon $6000 valuation of the 4277 shares of C 3, Inc., stock and two years of alimony totalling $13,200. The case was then set down for an uncontested hearing to be held on November 18, 1980.

On October 29, 1980, the plaintiff received a notice dated October 25, 1980, addressed to C 3, Inc., shareholders announcing a meeting on November 6, 1980, to consider approval of a three-for-one stock split of the common stock preparatory to going public with the stock. The plaintiff did not inform the defendant of this notice.

On November 12, 1980, C 3, Inc., notified the plaintiff by letter that the stock split had been approved at

---

[4] Both parties in their briefs refer to "C-3" stock. We use "C 3, Inc.," throughout this opinion which is the correct name of the stock as shown in the transmittal letter from the company to the plaintiff enclosing the 8554 additional shares.

the November meeting. The letter enclosed a certificate for 8554 shares and a copy of the C 3, Inc., "red herring" prospectus filed with the Securities and Exchange Commission (SEC) on November 12, 1980.

On November 14, 1980, the defendant, then living in Washington, D.C., happened to read an article in the Washington Post concerning a public offering of C 3, Inc., stock. The article said that the stock would be offered for between $24 and $28 per share for stock then worth $2.67 per share. The article made no reference to the recently completed stock split. On that same day, the defendant's attorney notified the plaintiff's attorney about the news of the public offering and cancelled the October 29 stipulation.

The defendant's attorney secured a copy of the SEC prospectus and mailed a copy to the plaintiff's attorney. He also talked on numerous occasions with brokers at E.F. Hutton, the underwriter of the C 3, Inc., public offering. The parties continued to negotiate further and on December 8, 1980, the defendant executed a new stipulation providing her the same two years of alimony, 50 percent of the house proceeds instead of the earlier 60 percent, and 2100 shares of the C 3, Inc., stock. She also prepared and executed another stipulation identical to the one newly negotiated, except that it gave her 2138 shares of C 3, Inc., stock rather than 2100 shares. Her December 8 letter to her lawyer explained that he should try to get 2138 shares *because it represents more exactly one half of the plaintiff's stock.* The plaintiff, however, would agree only to transfer 2100 shares of the stock and a stipulation providing for this was executed on December 9, 1980.

On December 12, 1980, an uncontested dissolution of marriage was granted based upon the stipulation of December 9. The plaintiff's affidavit showed total assets of $44,367 including the house proceeds, and a

monthly income of $3510. The affidavit was in manuscript form and at the bottom of page two it stated: "Securities: C-3 Corporation Common stock." On the next page, the following note is included: "The plaintiff has an interest in the Common Stock of C-3 Corporation which corporation is filing a registration with the Securities and Exchange Commission indicating a proposed sale price of $24–28 per share. This price is speculative and it is not known at this time when and if the public offering will become effective. The fair market value of the shares is $6,415.50, based upon the last known sales price of $0.50 per share. The shares have a low basis. The estimated Federal and State capital gains tax would be approximately 31 per cent, leaving a net value of $4,426.70. If the public offering becomes effective and assuming that the plaintiff's shares are free from restrictions on sale, the value could be substantially greater."

The defendant thereafter sold her stock on February 11, 1981, for $67,200 and on February 12, 1981, the defendant's counsel wrote to the plaintiff's counsel demanding an additional 4200 shares of C 3, Inc., stock. On March 2, 1981, the plaintiff's counsel wrote a letter refusing to transfer the additional shares to the defendant.

One fact is crystal clear from the record in this case. *Neither the defendant nor her attorney knew, when the dissolution judgment was rendered on December 12, 1980, that the C 3, Inc., stock, for which they had bargained as part of the property settlement, had split three-for-one.*

Before analyzing the facts in the light of controlling law, certain general observations must be made. The adversary system of justice is under particular stress in a dissolution action. The very name "adversary" requires putting two persons, who once shared life's

tenderest intimacies, in a position of combat. Both counsel, depending upon the complexity of the parties' affairs and the degree of conflict deemed necessary by one or both of the parties, can be expected to unlimber their big guns of discovery, cross-examination, and the like to ferret out information favorable to one side and inclined to discredit the other marriage partner.

Influential voices are heard questioning the way in which the adversary system is used. Chief Justice Warren Burger recently reached back to 1909 to quote Dean Roscoe Pound's axiom that the law is not a sporting contest. *Sullivan* v. *Wainwright,* 464 U.S. 109, 112, 104 S. Ct. 450, 78 L. Ed. 2d 210 (1983). (Burger, C.J., concurring.) The trial court, *Jacobson, J.,* precisely explicated the special and unique nature of the exchange of information in a domestic dispute when he stated in his memorandum of decision: "In dissolution actions particularly, both counsel and the court have special responsibilities with respect to agreements submitted by the parties. There must be reasonable inquiry into the wishes as well as the objective best interests of the client, and counsel have a special responsibility for full and fair disclosure for a searching dialogue, about all of the facts that materially affect the client's rights and interests," citing *Monroe* v. *Monroe,* 177 Conn. 173, 183, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979).

The trial court also has an affirmative obligation to determine whether a settlement agreement is "fair and equitable under all the circumstances." General Statutes § 46b-66. The court reviewed the stipulation at the dissolution hearing.[5] "Because of the emotionally-laden circumstances under which negotiations about marital dissolutions necessarily take place, reasonable inquiries

---

[5] The transcript of the dissolution hearing is not part of the record.

should be made to ensure, as far as possible, that reasonable settlements have been knowingly agreed upon. Nonetheless, even judicial failure to conduct a searching inquiry into the acceptability of a divorce settlement does not make the subsequent judgment of divorce vulnerable to collateral attack as a miscarriage of justice." *Monroe* v. *Monroe,* supra, 184.

The sworn financial statements of the parties under Practice Book § 463 have great significance in domestic disputes. They serve to facilitate the process and avoid the necessity of testimony in public by persons still married to each other regarding the circumstances of their formerly private existence. There was no claim in this case that counsel for the plaintiff misrepresented to the court the value of the C 3, Inc., stock. In fact, the trial court, in ruling on the motion to open the judgment of dissolution, found that both counsel "made every effort to meet [the] standards of professional responsibility on the basis of the information made available to them."

The traditional view of the adversary system is found in the plaintiff's brief which states: "The footnoted explanation as to the C-3 stock should have put the defendant's attorney on his guard." This statement ignores the purpose of a financial affidavit in a dissolution action, particularly one on which the parties' property settlement is based. Only full and frank disclosure can facilitate such settlements. Whatever the situation may be in contested dissolution actions, there should be at least a Geneva Convention of rules of war where the parties are able to work out the matter themselves. A good example of the atmosphere too frequently encountered in a domestic dispute under the adversary system is noted in the plaintiff's brief where he states, in reference to dissolutions: "unfortunately it is an adversarial relationship ordinarily characterized by wariness, suspicion and a total lack of good faith."

That the time has come to spike somewhat the forensic guns involved in matrimonial disputes was made clear by the Supreme Court in *Monroe* v. *Monroe,* supra, 182: "It may well be time to reconsider the role that lawyers and judges play in the matrimonial cases that appear in ever-increasing numbers before the courts. Analogies drawn from commercial litigation fail to respond adequately to the situation of emotional trauma commonly associated with the irretrievable breakdown of a marriage."

It is a recognized goal of our courts to foster settlement of domestic disputes. "With such judicial supervision, private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine. *Guyton* v. *Guyton,* 17 Ill. 2d 439, 444, 161 N.E.2d 832 (1959); *Paxton* v. *Paxton,* 201 Neb. 545, 547, 270 N.W.2d 900 (1978); *Viles* v. *Viles,* 14 N.Y.2d 365, 368–69, 251 N.Y.S.2d 672, 200 N.E.2d 567 (1964) (dissenting opinion); Lindey, Separation Agreements and Ante-Nuptial Contracts (2d Rev. Ed. 1978) p. 3-23." *Hayes* v. *Beresford,* 184 Conn. 558, 568, 440 A.2d 224 (1981). "Although the law will intervene to insure that substantial justice is done where fraud has been perpetrated, the frequency and extent of this intervention must be tempered by a sometimes conflicting adjudicative proposition that mandates the ultimate conclusion of all legal controversy. Thus, the setting aside of a judgment on the basis of fraud 'will only be granted if the [movant] is not barred by any of the following restrictions: (1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered. (2) There must have been diligence . . . in trying to discover and expose the fraud. (3) There must be clear proof of the perjury or fraud. (4) There must be a substantial likelihood that the result of the new trial will be different. James, Civil Procedure (1965) § 11.7, pp. 540–42; [note,]

36 Ill. L. Rev. 894, 896–97 (1942).' *Varley* v. *Varley,* 180 Conn. 1, 4, 428 A.2d 317 (1980).'' *Jucker* v. *Jucker,* 190 Conn. 674, 677, 461 A.2d 1384 (1983).

The plaintiff concedes that there was no laches or unreasonable delay by the defendant in moving to open the judgment of dissolution.

The question concerning the defendant's diligence in trying to discover and expose the fraud is a difficult one. The court expressly found lack of diligence on the part of the defendant's former attorney. After a careful look at the evidence, however, "in the particular circumstances of this case and given its context"; *Kenworthy* v. *Kenworthy,* 180 Conn. 129, 132, 429 A.2d 837 (1980); a different picture emerges. The negotiations between the parties, as reflected in the correspondence between the attorneys, were conducted in an open and cooperative manner.

Concerning knowledge of the defendant[6] and her attorney, it is only with hindsight that one can fault their performance. Neither had any reason to suspect a stock split. Nor were they even put on inquiry under the circumstances as to the possibility of such a split. The Washington Post article did not mention it. The defendant and her attorney knew that the plaintiff's attorney[7] was fully aware that the defendant was seeking one half of the C 3, Inc., stock because of her insistence on getting 2138 shares before she finally agreed to accept 2100 shares. The affidavit had the effect of obscuring the situation and did not candidly give evidence of the true picture concerning the plaintiff's assets.

---

[6] Unless otherwise stated herein, the term "defendant" refers to the defendant and her former attorney since they speak as one. See *Allen* v. *Nissley,* 184 Conn. 539, 542–43, 440 A.2d 231 (1981).

[7] The record is devoid of any finding as to whether the plaintiff's attorney knew of the stock split during the final negotiations leading to the stipulation of December 9, 1980.

The original affidavit noted 4277 shares valued at $4499.44. The parties' stipulation of October 29, 1980, established an agreed value of $6000 for the C 3, Inc., shares. Finally, and most importantly, the affidavit submitted at the dissolution hearing downplays the significance of the stock by placing it in a footnote and omitting this time the number of shares. The stated value in this latter affidavit was $6415.50, only slightly more than the $6000 figure agreed upon on October 29. The omission of the number of shares is a violation of Practice Book § 463 which requires an affidavit substantially in accordance with Practice Book Form 501.1. Form 501.1 lists "E. Stocks, Bonds, Mutual Funds (list company, *number of shares,* value)." (Emphasis added.) The overall effect was colossally misleading, for the footnoted item included an asset of 12,381 shares known then to be worth $24 to $28 per share. Thus, an item worth $407,944, compared to the plaintiff's entire sworn assets of $44,367, was so inadequately described in the footnote as to create a trap for the unwary.

The trial court found that since the footnote placed the value of the shares at $6415.50 on the basis of the last known sales price of fifty cents per share, one could easily ascertain the number of shares held by the plaintiff multiplying the given value by two. This is not a reasonable conclusion from the evidence unless the attorney examining the affidavit has been alerted to what he should look for.

This court has meticulously examined the SEC prospectus. It is lengthy, highly technical and baffling to the reader. It is very difficult to extract from it the fact that there had been a three-for-one stock split prior to the public offering. The table of contents makes no mention of a stock split. The prospectus summary on page three under "shares outstanding" states: "3,509,562 at September 30, 1980 after giving effect

to a recapitalization effective November 6, 1980." The prospectus further states under "Dilution" that the "information set forth below gives effect to the recent recapitalization of the Company." Finally, on page thirty, under note eleven of "Notes To Financial Statement," the prospectus, in describing the recapitalization of November 6, 1980, states that "each common stockholder was authorized to receive two additional shares of the newly authorized Common Stocks for each share of common stock then held." Nowhere in the thirty-one page prospectus is the term "stock split" used.

The trial court found that the defendant's attorney had read the prospectus. The information contained therein concerning "recapitalization" is meaningless to the reader unless he or she knew the number of shares before the recapitalization. It is totally unrealistic to find a lack of diligence in not ferreting out the information about the stock split from footnote eleven to the "notes to financial statement." The defendant was not deceived concerning the potential value of the stock since she and her attorney had learned that it would be issued to the public for $24 to $28 per share. She was, however, uninformed as to the number of shares held by the plaintiff. Under the totality of the circumstances, the court's conclusion of lack of diligence on the part of the defendant and her attorney cannot stand.

The leading case of *Jucker* v. *Jucker,* 190 Conn. 674, 461 A.2d 1384 (1983), is readily distinguishable. The *Jucker* court cited numerous detailed instances wherein the plaintiff had substantial knowledge of the matters about which she later complained. Id., 678. Nor does the case of *Valante* v. *Valante,* 180 Conn. 528, 529–30, 429 A.2d 964 (1980), dictate a different conclusion. The *Valante* court held that the defendant's complaint that there was insufficient information before the trial court

concerning the valuation of closely held stock could not prevail because the defendant had a full opportunity to cross-examine the plaintiff and could have used discovery proceedings. The *Valante* case arose in the context of a contested divorce dissolution trial quite unlike the circumstances in this case.[8]

We conclude that under the peculiar circumstances of this case neither the defendant nor her attorney lacked diligence so as to bar the defendant's right to open the judgment of dissolution.

We conclude that the trial court could not reasonably have found that the plaintiff's conduct was not fraudulent so as to bar the opening of the judgment of dissolution. "Fraud consists in deception practised in order to induce another to part with property or surrender some legal right, and which accomplishes the end desired." *Alexander* v. *Church,* 53 Conn. 561, 562, 4 A. 103 (1886), quoting Cooley, Torts, p. 474.

The case of *Miller* v. *Appleby,* 183 Conn. 51, 54–55, 438 A.2d 811 (1981), summarized the necessary elements of fraud as follows: "The essential elements for an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury."

The plaintiff's conduct in this case falls squarely within the doctine of fraudulent nondisclosure as stated in the recent case of *Wedig* v. *Brinster,* 1 Conn. App. 123, 130–31, 469 A.2d 783 (1983): "Concerning fraudulent nondisclosure, the court found that the Brinsters

[8] To require counsel in an amicably settled dissolution action with the apparently simple asset pattern of this case to file disclosure motions would impose on counsel a duty of practicing law defensively, a practice of widespread concern in the medical profession.

had an affirmative duty to disclose the septic system problems. In *Franchey* v. *Hannes,* 152 Conn. 372, 379, 207 A.2d 268 (1965), the court held that once a vendor assumed to speak, 'he must make a full and fair disclosure as to the matters about which he assumes to speak.' He must then avoid a deliberate nondisclosure. Id. To constitute fraud by nondisclosure or suppression, 'there must be a failure to disclose known facts and . . . a request or an occasion or a circumstance which imposes a duty to speak.' *Duksa* v. *Middletown,* 173 Conn. 124, 127, 376 A.2d 1099 (1977); *Ceferatti* v. *Boisvert,* 137 Conn. 280, 283, 77 A.2d 82 (1950). This duty arises when a vendor of property conceals from the vendee a material fact affecting it. A vendor of property may not do anything to conceal from the vendee a material fact affecting it, or say or do anything to divert or forestall an intended inquiry by him, or deliberately hide defects, for, in so doing, he is not merely remaining silent, but is taking active steps to mislead. *Egan* v. *Hudson Nut Products, Inc.,* 142 Conn. 344, 348, 114 A.2d 213 (1955); *Gayne* v. *Smith,* 104 Conn. 650, 652, 134 A. 622 (1926). '[T]he nondisclosure must be by a person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction.' *Egan* v. *Hudson Nut Products, Inc.,* supra, 347–48." *Wedig* v. *Brinster,* supra. The key element in a case of fraudulent nondisclosure is that there must be circumstances which impose a duty to speak. In this case, such a duty is imposed by Practice Book § 463 which requires affidavits in domestic cases and by Practice Book Form 501.1 to which it refers.

The plaintiff did make a false representation as a statement of fact by reason of a fraudulent nondisclosure concerning the number of C 3, Inc., shares he held at the time of the dissolution. In presenting the

information concerning the C 3, Inc., shares in the form he filled out, the plaintiff knowingly made an untrue representation. The representation was made to induce the defendant to act upon it. That is the self-evident purpose of such affidavits. The defendant did act on that misrepresentation to her great injury. That the plaintiff's posture amounted to fraudulent non-disclosure intended to induce the defendant to act to her detriment is made abundantly clear by his response at a deposition held on October 20, 1981, where, when asked whether the defendant and her attorney knew about the C 3, Inc., stock split at the time they agreed to take 2100 shares as part of the settlement, the plaintiff replied: "If they didn't know it was their problem."

There is a very substantial likelihood that the result of a new trial will be different. Considering all of the statutory criteria for distribution of assets and for alimony in a dissolution action; General Statutes §§ 46b-81, 46b-82; we conclude that it is highly likely that a new trial, with all of the cards on the table, will produce a different result.

We are well aware of the limited role of this court in reviewing factual findings of the trial court, particularly in domestic cases. "A factual finding may be rejected by this court only if it is 'clearly erroneous.' Practice Book § 3060D." *Kaplan* v. *Kaplan*, 186 Conn. 387, 392, 441 A.2d 629 (1982). The trier of fact has wide latitude in its interpretation of the evidence and the conclusions to be drawn therefrom. " '[T]rial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant.' " *Figlar* v. *Figlar*, 174 Conn. 151, 153, 384 A.2d 1 (1978). "This court may not substitute its own opinion . . . for the factual finding of the trial court." *Kaplan* v. *Kaplan*, supra.

We are equally aware of the danger of opening the floodgates to a wave of motions to open dissolution judgments by dissatisfied litigants. Where, as in this case, however, a clear case is made under applicable law that a fraudulent and material misrepresentation by one party resulted in a substantial injustice to the other party, we must not hesitate to act. This is such a case.

The conclusion of the trial court that the defendant had failed to establish the elements of fraud was clearly erroneous. In view of our disposition of the case we do not consider the other grounds of appeal raised by the defendant.

There is error, the judgment denying the motion to open is set aside and the case is remanded with direction to grant the motion to open the judgment of dissolution dated December 12, 1980, and to proceed in accordance with the law.

In this opinion the other judges concurred.