MM GLOBAL SERVICES, INC.; MM Global Services Pte., Ltd., Mega Vista Solutions (S) Pte., Ltd., and Mega Visa Marketing Solutions Ltd.; Plaintiffs,

v.

THE DOW CHEMICAL COMPANY; Union Carbide Corporation, Union Carbide Asia Pacific, Inc., Union Carbide Customer Services Ptd., Ltd., and Dow Chemical Pacific (Singapore) Pte., Ltd., Defendants.

No. CIV.3:02cv1107(AVC).

United States District Court, D. Connecticut.

Sept. 12, 2003.

Michael S. Elkin, Richard S. Taffet, Susan B. McInerney, Thelen, Reid & Priest, New York City, Robert M. Langer, Wiggin & Dana, Hartford, CT, Stephen B. Harris, Wiggin & Dana, New Haven, CT, Suzanne Ellen Wachsstock, Wiggin & Dana, Stamford, CT, William L. Webber, Morgan, Lewis & Bockius, Washington, DC, for Plaintiffs.

Craig A. Raabe, Edward J. Heath, Elizabeth A. Fowler, Robinson & Cole, Hartford, CT, Mark P. Edwards, Morgan, Lewis & Bockius LLP, Philadelphia, PA, William L. Webber, Morgan, Lewis & Bockius, Washington, DC, for Defendants.

### *RULING ON THE DEFENDANTS' MOTIONS TO DISMISS*

COVELLO, District Judge.

This is an action for damages arising out of a business arrangement pursuant to which the plaintiffs purchased chemicals, polymers, and other products from the defendants and resold them to customers located in India. The amended complaint alleges violations of the Sherman Antitrust Act, 15 U.S.C. § 1, the Connecticut Antitrust Act, Conn. Gen.Stat. §§ 35-26 and 28(a), the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42-110b, and common law tenets concerning breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation and non-disclosure, negligent misrepresentation, tortious interference with business expectancies, tortious interference with contractual relationships, and unfair competition.

The defendants, Dow Chemical Company and Union Carbide Corporation, now move pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss the federal antitrust claim for want of subject matter jurisdiction. The defendants also move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint in its entirety for failure to state a claim upon which relief can be granted.

The issues presented are: 1) whether the court has subject matter jurisdiction to adjudicate the claimed violation of the Sherman Antitrust Act, 15 U.S.C. § 1; 2) the choice of law to be applied to the claim of breach of contract and the claim of breach of the implied covenant of good faith and fair dealing; 3) whether the amended complaint states a cause of action for breach of contract; 4) the choice of law to be applied to the claim of tortious interference with business expectancies, tortious interference with contractual relationships, unfair competition, fraudulent misrepresentation, negligent misrepresentation, violations of the Connecticut Unfair Trade Practices Act, and violations of the Connecticut Antitrust Act; and 5) whether the amended complaint states a cause of action for fraudulent misrepresentation and negligent misrepresentation.

For the reasons hereinafter set forth, the court concludes: 1) the court has subject matter jurisdiction to adjudicate the claimed violation of the Sherman Antitrust Act, 15 U.S.C. § 1; 2) the law of Singapore governs the breach of contract claims and, because Singapore does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing, that claim is dismissed; 3) the amended complaint alleges with adequate particularity a cause of action for breach of contract; 4) the law of India governs the tort claims and, because that country does not recognize a cause of action for tortious interference with business expectancies, tortious interference with contractual relationships or unfair competition, those claims are also dismissed. Further, because the claimed violations of the Connecticut Unfair Trade Practices Act and the Connecticut Antitrust Act are also governed by the law of India, and India does not have a similar basis for relief, those claims are dismissed

as well. Finally, the court concludes that: 5) the amended complaint fails to state a claim for fraudulent misrepresentation, but sets forth with adequate particularity a claim for negligent misrepresentation. The motion to dismiss the antitrust claim for want of subject matter jurisdiction is therefore DENIED. The motion to dismiss the amended complaint for failure to state a claim is GRANTED in part and DENIED in part.

*FACTS*

Examination of the amended complaint and supplemental documents, including affidavits and exhibits submitted in connection with the instant motion, set forth the following material facts. The defendant, Union Carbide Corporation ("Union Carbide") is engaged in the manufacture and sale of chemicals, polymers, and other specialty products to customers located in the United States and throughout the world. It is incorporated in New York with its corporate headquarters and principal place of business located in Danbury, Connecticut.

In December 1984, lethal gas escaped from Union Carbide's plant in Bhopal, India. The leak caused the death of 3,800 persons and injuries to an additional 200,000. In February 1989, Union Carbide and its Indian affiliate were ordered to pay a total of $470 million for all civil claims arising from the tragedy.

In the aftermath of this tragedy, Union Carbide ceased selling products directly to customers in India and, in 1987, Union Carbide, through its subsidiary, Union Carbide Eastern, Inc. ("UCE"), appointed the plaintiff, Mega Vista Marketing Solutions Ltd. ("MVMS") as a non-exclusive distributor to maintain Union Carbide's access to the Indian marketplace. MVMS[1]

---

1. MVMS was then known as Visa Petrochem- cials Pvt. Ltd.

is an Indian corporation, having its principal place of business in Mumbai, India.

The relationship between Union Carbide and MVMS was memorialized in a letter agreement dated November 16, 1987 ("the 1987 letter agreement"). As stated therein, Union Carbide appointed MVMS as a "non-exclusive distributor/indentor in India" for Union Carbide products. MVMS agreed to "canvas and promote" the products, and to establish contact with potential customers in India on behalf of Union Carbide. UCE did not grant MVMS authority to accept any order from any prospective customer or to undertake any act that would bind Union Carbide under a contract of sale or otherwise. Further, under the 1987 letter agreement, Union Carbide agreed to pay MVMS a commission on all sales arranged by MVMS in India. Union Carbide had the right to terminate the 1987 letter agreement in its sole discretion on ninety days written notice.

In 1993, Union Carbide requested that MVMS form separate corporate affiliates and open offices outside India that would buy Union Carbide products in the United States and resell them to end-users in India. MVMS complied with the request, and formed the plaintiff, Mega Global Services, Inc. ("MMGS") a Texas corporation with a principal place of business in Houston. MVMS also formed the plaintiff, Mega Global Services, Inc.—Singapore ("MMGS–S"), a business entity organized under the laws of Singapore with a principal places of business in that country. In addition, Union Carbide formed the defendant, Union Carbide Asia Pacific, Inc. ("UCAP") and the defendant, Union Carbide Customer Services Pte. Ltd. ("UCCS") to assist product sales in India.

UCAP is a corporation organized under the laws of Delaware with a principal place of business in Singapore. UCCS is a corporation organized under the laws of Singapore with a principal place of business in that country.

Thereafter, on April 5, 1993, Union Carbide, acting through UCAP, terminated the 1987 letter agreement with MVMS and, on the same day, UCAP confirmed its agreement to sell products to MMGS by way of another letter agreement ("the 1993 letter agreement"). Under the 1993 letter agreement, MMGS succeeded MVMS as the non-exclusive distributor of Union Carbide products in India. As with MVMS, MMGS purchased products from UCAP, with title and risk of loss passing to MMGS in the United States, and MMGS then resold the products from the United States to end-users in India. Terms relating to volume, specifications, price, payment and delivery were set forth in transactional documents relating to specific orders, including purchase orders, invoices, order acknowledgments and shipping receipts.

During the period of 1993 through 2000, MMGS–S intermittently purchased products from Union Carbide in the United States under the same terms and conditions as established between UCAP and MMGS. The orders were processed in the United States and MMGS–S made payments for and took title to the products in the United States through banking channels set up with Union Carbide.[2]

On September 8, 1995, UCAP and MMGS reaffirmed their relationship by way of a new letter agreement ("the 1995 letter agreement") with UCAP sending the

2. The defendants maintain that, to the contrary, MMGS–S paid for the products in Singapore.

letter from Singapore to MMGS's offices in Texas. The letter stated:

This is to confirm Union Carbide's interest in selling to MM Global Services Inc. (MMGS) from time to time effective as of 8th September, 1995, certain of Union Carbide's products for resale by MMGS to customers located in India.

Each such sale, of course, would be contingent upon the continuing interest of MMGS and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. However, certain aspects of our dealings should be consistent such as the following:

— Unless otherwise specified by the parties, all shipments under this contract shall be made on MMGS's behalf and in MMGS's name as shipper. MMGS shall have title to product and shall bear all risks associated with product from the time when product has effectively passed the ship's rail at the point of shipment.

— Unless otherwise requested by MMGS, Union Carbide will arrange ocean transportation with its usual carriers. The issue as to which party bears the cost of such transportation shall be negotiated on a case by case basis.

— MMGS purchase price will customarily include a mutually acceptable reseller's discount that will be established based on the product, volumes, etc.

— MMGS will consign and sell all the products, as supplied by Union Carbide Corporation, only to the customers in India and not to customers in any other country in the world. If MMGS sells any of these products in any countries outside India, the Distributorship arrangement with MMGS

will forthright be terminated without any notice.

We recognize that there may be instances when it is more economical or otherwise efficient for MMGS to purchase products from the stock of the appropriate Union Carbide affiliate in the Asia/Pacific region such as Union Carbide Asia Limited in Hong Kong. In such cases, Union Carbide will recommend to its affiliate that it follow the same protocol set forth in this letter. There also may be instances where Union Carbide will elect not to sell MMGS a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer. However, we trust that we will be in agreement on the vast majority of such instances.

We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

In 1998, at Union Carbide's direction, MMGS assigned all of its rights and duties under the 1995 letter agreement to MMGS–S. MMGS–S thereafter assumed all purchasing of the products for en-users in India. The purchases continued to be made by Union Carbide in the United States, and MMGS–S made payments in Singapore. Delivery of the products occurred in the Gulf states area of the United States with resale to end-users in India. MMGS–S made contract payments in the United States through banking channels and a standby letter of credit.

In 2000, the plaintiff, Mega Vista Solutions (S) Pte. Ltd. ("MVS") succeeded MMGS–S with respect to all of MMGS–S's business activities. MVS is a business entity organized under the laws of Singapore with a principal places of business in that country. MVS and UCAP memorialized

their relationship in a letter agreement, dated June 27, 2000, restating the parties' relationship ("the 2000 letter agreement"), with UCAP in Singapore sending the letter to MVS's offices in Singapore. The terms of the 2000 agreement, for all relevant purposes, were the same as reflected in the 1993 and 1995 agreements, including the following paragraphs:

> This is to confirm Union Carbide's interest in selling to M/s Megavisa Solutions (S) Pte. Ltd. (Megavisa) from time to time effective as of 1st July 2000, certain of Union Carbide's products for resale by Megavisa to customers located in India.

> Each such sale, of course, would be contingent upon the continuing interest of Megavisa and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. . .

> . . . . .

> We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

The 2000 letter agreement had a one year duration and authorized UCAP to terminate it on 90 days notice. During the period covered by the 1995 and 2000 letter agreements, the resale of Union Carbide products accounted for at least 85% of the plaintiffs' business.

In or around August 1999, Union Carbide announced a plan of merger with the co-defendant herein, Dow Chemical Company ("Dow"). Dow is a corporation organized under the laws of Delaware, with a principal place of business in Midland, Michigan. The amended complaint alleges that with the plan of merger, the need dropped for the re-sale services in India previously performed by MVMS, MVS, MMGS and MMGS–S. Consequently, the amended complaint alleges that Union Carbide and its affiliates ceased acting consistently with their alleged contractual and legal obligations and, in particular, undertook efforts to establish Dow, untainted by the Bhopal tragedy, in place of the plaintiffs as a direct seller of products to end-users in India.

On February 6, 2001, Union Carbide merged with a subsidiary of Dow and became a wholly owned subsidiary of Dow. At around this time, Dow also created the defendant, Dow Chemical Pacific (Singapore) Private Ltd. ("Dow Singapore"). Dow Singapore is a wholly owned subsidiary of Dow and is incorporated in Singapore with a principal place of business in that country. Dow created Dow Singapore to effectuate sales of Union Carbide products to the plaintiffs and to further Union Carbide and Dow's relationship with the plaintiffs. Dow Singapore succeeded to UCAP's relationship with MVS. On January 16, 2002, Dow Singapore advised MVS that, effective March 31, 2002, MVS would no longer be a distributor for Union Carbide products other than wire and cable compounds. MVS refused to continue the relationship with Dow Singapore on those terms.

On June 25, 2003, the plaintiffs MVMS (India), MVS (Singapore), MMGS (Texas) and MMGS–S (Singapore) commenced this lawsuit against the defendants, Union Carbide Corporation (Connecticut), Dow Chemical Company (Michigan), Union Carbide Asia Pacific, Inc. ("UCAP") (Singapore), Union Carbide Customer Service Pte. Ltd. ("UCCS") (Singapore), and Dow Chemical Pacific Private Ltd. (Singapore). The amended complaint alleges that, from 1993 through March 2002, Union Carbide and Dow, directly and through the above named affiliates, compelled the plaintiffs to agree to engage in a price maintenance conspiracy with respect to the resale of Union Carbide products in India, and refused to accept orders or cancelled accept-

ed orders if the prospective resale prices to end-users in India were below certain levels. According to the amended complaint, Dow and Union Carbide sought to "ensure that prices charged by [the][p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users... in the United States as well as in other jurisdictions..," and that,

> [a]s a direct and proximate result of [the][d]efendants fixing of minimum resale prices and other terms of sale, competition in the sale and resale of [Union Carbide] products in and from the United States was improperly diminished and restrained...

Further, the amended complaint alleges that, starting in mid–1999 and continuing until 2002, Union Carbide, acting through the defendants, UCAP and UCCS, refused to authorize orders placed by the plaintiffs for Union Carbide products and arbitrarily declined to fill orders that had been placed and accepted, knowing that such actions would "severely damage[ ][the] plaintiffs' relationships with long term strategic customers." The amended complaint further alleges that after the merger, Dow, acting through the other defendant-affiliates herein, purposefully implemented a series of unjustified contract modifications, such as reducing the credit limit available to the plaintiffs and changing their billing practices, all to make it impossible for the plaintiffs to make timely payments on invoices. When, as a consequence, the plaintiffs were late in making payments, the amended complaint alleges that the defendants imposed a credit hold on shipments to the plaintiffs, and deliberately refused to release pending orders.

Further, the amended complaint alleges that: (1) Dow, acting through Dow India, contacted the plaintiffs' customers and told them that the plaintiffs were experiencing financial difficulties and, in this way, undermined the plaintiffs' relationships with their customers at a time when the plaintiff were unable to obtain shipments due to the changes in billing and credit terms, causing the plaintiffs' customers to establish relationships with other vendors; and (2) the defendants, in order to induce the plaintiffs to disclose confidential customer information, characterized the parties' future relationship as long term, and then used the confidential information to establish direct sales to the plaintiffs' customers.

## STANDARD

■ A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) must be granted if a plaintiff has failed to establish subject matter jurisdiction. *Golden Hill Paugussett Tribe of Indians v. Weicker,* 839 F.Supp. 130, 136 (D.Conn. 1993). In analyzing a motion to dismiss under Rule 12(b)(1), the court must accept all well pleaded factual allegations as true and must draw reasonable inferences in favor of the plaintiff. *Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir. 1993). Where a defendant challenges the district court's subject matter jurisdiction, the court may resolve disputed factual issues by reference to evidence outside the pleadings, such as affidavits. *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991).

The defendants have also moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When ruling on a 12(b)(6) motion, the court must presume that all well-pleaded facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). The court may consider only those facts

"stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). A court may dismiss a complaint at this stage only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

### *DISCUSSION*

#### I

#### Federal Antitrust Claim

The defendants first move to dismiss count one of the amended complaint which alleges that the defendants coerced the plaintiffs into agreeing to fix the resale price of Union Carbide products in India, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. The defendants assert that, because the amended complaint alleges price fixing occurring in India that is not alleged to have a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States, the court is deprived of subject matter jurisdiction over the claim by the Foreign Trade and Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a. In response, the plaintiffs assert that, because price fixing is *per se* illegal under the Sherman Act, there is a presumption of anticompetitive effect constituting a direct, substantial and reasonably foreseeable effect on United States commerce and, hence the court has jurisdiction to hear the claim.

■ Section 1 of the Sherman Act provides in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. An agreement between a manufacturer and a distributor to fix prices is *per se* illegal under the Sherman Act. *Monsanto Company v. Spray–Rite Service Corp.*, 465 U.S. 752, 759, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *see also Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) (vertical price fixing is *per se* illegal). "*Per se* violations do not require a showing of deleterious impact on competition . . . [and] create a presumption of anticompetitive effect." *Gianna Enterprises v. Miss World Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y.1982); *see also United States v. National Assoc. of Real Estate Bds.*, 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). This is so because of their "pernicious effect on competition and lack of any redeeming virtue." *Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

■ The reach of the Sherman Act, however, is limited. *Metallgesellschaft AG v. Sumitomo Corp.*, 325 F.3d 836, 838 (7th Cir.2003). Under an amendment to the Sherman Act, known as the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), the court does not have jurisdiction to adjudicate antitrust conduct that:

involv[es] trade or commerce (other than import trade or import commerce) with foreign nations unless:

(1) such conduct has a direct, substantial, and reasonably foreseeable effect:

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce With foreign nations, of a person engaged In such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.

If [the Sherman Act applies] to such conduct because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

*Id.* Consequently, antitrust conduct directed at foreign markets that has no effect on the domestic market is beyond the reach of this court. *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir.2002); *Metallgesellschaft AG v. Sumitomo Corp.*, 325 F.3d at 838. Where there is a domestic effect, the court has jurisdiction to hear the claim only where the conduct "reduces the competitiveness of the domestic market...[or] mak[es] possible anticompetitive conduct directed at domestic commerce." *Id.* at 399–401 (*citing National Bank of Canada v. Interbank Card Assoc.*, 666 F.2d 6, 8 (2d Cir.1981)). To establish jurisdiction, a plaintiff need only demonstrate conduct directed "at both domestic and foreign markets [that] actually reduced the competitiveness of a domestic market... [or] [otherwise] mak[es] possible anticompetitive conduct that 'give[ ] rise to a claim' under the Sherman Act." *Kruman,* 284 F.3d at 401.

■ Because the amended complaint alleges a *per se* violation of the Sherman Act, the anticompetitive effect of the alleged conduct is presumed. Because the amended complaint and evidentiary record support the conclusion that such conduct was directed at both the foreign and domestic market, the court concludes that it has jurisdiction. The amended complaint

alleges that the defendants coerced the plaintiffs into agreeing to fix the resale price of Union Carbide products in India, and that they did so in order to "ensure that prices charged by [the][p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users... *in the United States* as well as in other jurisdictions..," and that,

> [a]s a direct and proximate result of [the][d]efendants fixing of minimum resale prices and other terms of sale, competition in the sale and resale of [Union Carbide] products in and from *the United States* was improperly diminished and restrained...

Further, documentary evidence submitted in connection with the instant motion suggest that the defendants made pricing decisions for the Indian market based on anticipated domestic market consequences.[3] Because there is alleged antitrust conduct directed at both domestic and foreign markets, the plaintiffs have established that their claim involves a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States and, accordingly, the motion to dismiss count one for lack of subject matter jurisdiction is denied.

## II

### The State Law Claims

#### *Choice of Law*

The defendants next argue that, under choice of law analysis, the laws of India or Singapore apply to the plaintiffs' state law claims. Consequently, for those state law

---

**3.** By way of illustration, the record reflects various e-mails and correspondence in which: (1) the defendants refused orders placed by the plaintiffs because of domestic market pricing concerns (Decl. of R. Taffet, Exh.D); (2) that the defendants examined competitive

pricing during world strategy meetings (Decl. of R. Taffet, Exh. E); and (3) that the defendants considered the firmness of domestic prices before deciding whether to meet competitive pricing in the India market. (Decl. of R. Taffet, Exh.H).

claims set forth in the amended complaint that are not recognized under the laws of India or Singapore, the defendants argue that dismissal is appropriate. With respect to the claims that are recognized under foreign law, i.e., the breach of contract claims and the misrepresentation claims, the defendants argue that the law of Singapore or India is controlling. In response, the plaintiffs maintain that, to the contrary, under Connecticut choice of law rules, Connecticut law governs their claims and therefore, neither dismissal nor application of foreign law is appropriate here.

■ In a diversity action, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In Connecticut, the rule requires the court to select the local law of the state having the most significant relationship to the occurrence and the parties to the dispute. *Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, 243 Conn. 401, 408–14, 703 A.2d 1132 (1997); *O'Connor v. O'Connor*, 201 Conn. 632, 652, 519 A.2d 13 (1986); Restatement (Second) of Conflict of Laws § 188.

### 1. The Contract Claims

■ The amended complaint alleges causes of action based on Connecticut common law precepts concerning breach of contract and breach of the implied covenant of good faith and fair dealing. In applying the most significant relationship test in disputes involving contracts, the court examines: (a) the place of contracting, which is the place where occurred the last act necessary to give the contract binding effect; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, resi-

dence, nationality, place of incorporation and place of business of the parties. *Reichhold Chemicals, Inc.*, 243 Conn. at 409–10, 703 A.2d 1132; *see also* Restatement (Second) of Conflict of Laws § 188(2)(e).

■ Applying these factors, the court concludes that the law of Singapore governs the contract claims. The amended complaint alleges contract violations beginning in mid–1999 and then continuing until the end of the parties' relationship in 2002. During this period, the relationship among the parties was governed by the 1995 and 2000 letter agreements. The parties do not dispute that the last act necessary for these two agreements to become binding occurred in Singapore and, specifically, with the confirmation letters that UCAP sent to MMGS and MVS from UCAP's offices in Singapore. Hence, the place of contracting is Singapore.

With respect to the second factor, i.e., the place of contract negotiation, there is simply no one place of contract negotiation. The plaintiffs negotiated the agreements from Singapore. Union Carbide claims to have negotiated them from Connecticut. With respect to the third factor, i.e., contract performance, there is, as well, no one place of contract performance. At least part of Union Carbide's contractual obligations were performed in Connecticut, as Union Carbide is headquartered in Danbury. The great majority of the performance contacts, however, occurred outside of the state of Connecticut and, specifically, in the Gulf states and Asia. In this regard, the products at issue were delivered to MMGS and MMGS–S in the Gulf states, and contract payments were made in the United States, though the amended complaint fails to identify any particular state or region.

There is also no link between Connecticut and the fourth consideration, that is,

the location of the subject matter of the contract, i.e., the chemical products. With respect to the fifth consideration, i.e., the domicile, residence, nationality, place of incorporation and place of business of the parties, the relevant contacts point to Singapore. Specifically, three of four plaintiffs have offices in Singapore, three of five defendants have their principal place of business in Singapore (including UCAP, Dow Singapore, and UCCS), and two of the four plaintiffs (MMGS–S and MVS), and two of the defendants (Dow Singapore and UCCS) are incorporated in Singapore. In sum, the only contact that this case has to Connecticut is that it is the state where one of five named defendants is headquartered. This is an insufficient basis for applying Connecticut law. *See e.g., Patch v. Stanley Works,* 448 F.2d 483, 491 (2d Cir.1971) (applying foreign law because "all the substantial contacts—save only the defendant corporation's factory and offices [located in Connecticut]—are found in New Hampshire"). The contract claims are therefore governed by Singapore law.

### A. *Breach of Contract*

The defendants next move to dismiss count two of the amended complaint alleging breach of contract. The defendants argue that the letter agreements are not contracts but simply letters that impose no obligations upon the plaintiffs to make purchases or upon the defendants to make sales and, hence, are void for want of mutuality of obligation. Further, the defendants assert that, to the extent the plaintiffs intend to base their breach of contract claim upon agreements for specific product shipments, the plaintiffs have failed to allege the essential elements for such a claim.

In response, the plaintiffs maintain that the letter agreements do constitute valid contracts and that, while certain terms were left to future agreement, such terms were agreed upon and reflected by invoices and other transactional documentation and that, moreover, the parties' course of dealing reflects the parties' recognition that binding contractual obligations existed. Further, the plaintiffs assert that, contrary to the defendants' argument, the amended complaint sets forth the essential elements for the breach of contract claim under Fed.R.Civ.P. 8(a), in that, among other things, the defendant allegedly refused to fill orders that had already been accepted.

### (i) The Letter Agreements

The court agrees with the defendants that the letter agreements do not constitute enforceable contracts as they are unenforceable for want of mutuality. As set forth above, Connecticut choice of law principles direct that the law of Singapore govern the contract claims. Under Singapore law, mutuality of obligation is necessary for a contract to be enforceable.[4] It is generally accepted in the common law of this country that agreements that impose no specific purchase obligation on a distributor cannot obligate a manufacturer to sell to the distributor. *Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.,* 173

---

**4.** The defendants have submitted the affidavit of one Edward Lam Chung Weng, an advocate and solicitor of the Supreme Court of the Republic of Singapore. In his statement at ¶ 15, Weng asserts that under the law of Singapore, if "a distribution agreement contains no provision, express or implied, requiring both parties to buy and sell from one another, Singapore courts will not impose liability on the supplier for refusing to accept orders from the distributor." The plaintiffs do not challenge the statement. Accordingly, the court concludes that under Singapore law, as with the common law found in the United States, mutuality is required for enforcement of an contract.

Ga.App. 825, 328 S.E.2d 426, 430 (1985). In such cases, mutuality of obligation is lacking, and the agreement is therefore unenforceable. *Kraftco Corporation v. Kolbus*, 1 Ill.App.3d 635, 274 N.E.2d 153, 156 (1971) (holding that an alleged oral agreement between a manufacturer and a distributor lacked mutuality of obligation, and was enforceable where the distributor "had no obligation to sell any specific quantity and no obligation to meet any quotas"). "An agreement that does not expressly or impliedly require the distributor to purchase any amount of product from the manufacturer is more accurately characterized as an offer to buy, rather than a binding contract." *Parks v. Baldwin Piano & Organ Co.*, 262 F.Supp. 515, 519 (D.Conn.1967) ("At most, the terms of this purported contract were binding only as to deliveries actually made under it.") *aff'd*, 386 F.2d 828 (2d Cir.1967). Moreover, under current orthodoxy, an obligation cannot be constructed based on an illusory or indefinite promise, that is, a promise "cloaked in promissory terms, but which, on closer examination, reveals that the promisor is not committed to any act or forbearance." *See* Calamarie & Perillo, *The Law of Contracts*, § 4.12(b)(4) (Mutuality of Obligation and Illusory Promises) (2001).

■ The amended complaint alleges contract breaches beginning in mid–1999 and continuing thereafter through 2002. The applicable letter agreements are the 1995 and 2000 agreements. Because the authenticity of these documents are not in dispute, the court may consider them at the Rule 12(b)(6) juncture. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1219–20 (1st Cir.1996) (noting that written documents integral to a complaint, including contracts, are not considered matters outside the pleadings for purposes of Rule 12(b)). Each of the agreements state, in relevant part:

> This is to confirm *Union Carbide's interest* in selling to [the plaintiff] from time to time effective as of 8th September, 1995, certain of Union Carbide's products for resale by [the plaintiff] to customers located in India.
>
> *Each such sale, of course, would be contingent upon the continuing interest of [the plaintiff] and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery.* However, certain aspects of our dealings should be consistent such as the following.
>
> — Unless otherwise specified by the parties, all shipments under this contract shall be made on MMGS's behalf and in MMGS's name as shipper...
>
> . . . . .
>
> We sincerely *look forward to developing* a mutually beneficial relationship in the days ahead.

As set forth above, the letter agreements do not obligate Union Carbide to sell anything to the plaintiffs or require the plaintiffs to purchase any products from any of the defendants. The language of the letters is illusory, reflecting only Union Carbide's "interest" in selling products to the plaintiffs. The actual sale, as the letters make clear, would be contingent upon a future mutual agreement on specific contract terms. The letters set no purchase quotas nor require the plaintiffs to deal exclusively[5] in the defendants' products.

---

5. If the plaintiffs had promised to obtain the products *exclusively* from the defendants, a valid requirements contract may well have existed. "In the absence of such a promise [of exclusivity], or some other form of consideration, the requisite mutuality and consideration for a requirements contract is absent." *Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.*, 173 Ga.App. 825, 328 S.E.2d 426, 429 (1985). Without an exclusive arrangement,

Instead of obligating the defendants to make sales, the letter agreements merely state certain terms, i.e., transportation terms, that would apply if the parties later agreed on a particular sale. Consequently, the agreements reflect an indefinite arrangement, imposing no executory obligation on Union Carbide. While evidence of the parties' course of dealing may further define the undertaking at issue here, it cannot be employed to override the clear and unambiguous language of these agreements. *See e.g., Crescent Oil & Shipping Services, Ltd. v. Phibro Energy, Inc.,* 929 F.2d 49, 52 (2d Cir.1991). Such indefinite agreements as exist here, devoid of the fundamental requisite of mutuality of obligation, are not enforceable against Union Carbide and do not constitute binding contracts for breach of which an action for damages may be maintained. At most, the terms of the agreements were binding as to sales actually made.

### (ii) Agreements for Specific Product Shipments

 The court agrees with the plaintiffs that the amended complaint alleges with sufficient particularity a cause of action for breach of contract in connection with specific product shipments that the defendants allegedly agreed to make under the letter agreements but refused to fill. As set forth above, Connecticut choice of law principles direct that the law of Singapore govern the contract claims. Under Singapore law, the elements of a cause of action for breach of contract are the same as exist under the common law of this

country[6] and consist of allegations constituting: (a) the existence of a contract or agreement; (b) the defendant's breach of the contract or agreement; and (c) damages resulting from the breach. *Chem–Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123, 130 (D.Conn.1993). In this case, the amended complaint alleges that: (a) the plaintiffs and the defendants entered into a series of agreements whereby the plaintiffs purchased products from the defendants; (b) that the defendants breached their obligations and duties under these agreements by, among other things, failing to fill accepted orders and release accepted orders; and (c) that the plaintiffs suffered damages as a result. This constitutes a "short and plain statement of the claim" as required by Federal Rule of Civil Procedure 8(a).

### B. Breach of The Implied Covenant of Good Faith And Fair Dealing

 In count three, the amended complaint alleges a cause of action for breach of the covenant of good faith and fair dealing that is implied in every contract. Because this cause of action is derivative of an action for breach of contract, *see e.g., Alter v. Bogoricin,* No. 97 Civ. 0662, 1997 WL 691332, *7 (S.D.N.Y.1996); *Union Trust Co. v. 714 Main Associates,* No. 312088, 1993 WL 7562, *15 (Conn.Super.Ct., January 6, 1993), the same choice of law analysis applies to the implied covenant claim as applies to the breach of contract claim and, accordingly, the law of Singapore governs. As the law of Sing-

---

"[t]he promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer." *Id. (citing Propane Industrial v. Gen. Motors Corp.,* 429 F.Supp. 214, 219 (W.D.Mo.1977)). *See also Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 90–91, 118 N.E. 214, 214 (1917) and Uniform Commercial Code § 2–304 (implying promise

on part of seller to use best efforts to supply goods—a promise constituting valid consideration so as to defeat a claim of lack of mutuality—where buyer agrees to deal *exclusively* in the seller's products).

**6.** Affidavit of Edward Lam Chung Weng, advocate and solicitor of the Supreme Court of the Republic of Singapore, at ¶¶ 6–8.

apore does not authorize an action for breach of the implied covenant of good faith and fair dealing[7], dismissal is required. *See e.g., Atlantic Richfield Co. v. Arco–Globus Int'l Co.*, No. 95 Civ. 6361, 1996 WL 742863, \*5 (S.D.N.Y.1996) (dismissing common law claim alleging unfair competition because choice of law rules dictated that Russian law apply, and complaint did not articulate a basis for relief under Russian law).

### 1. The Tort Claims

▮▮▮ The amended complaint also alleges causes of action based on Connecticut common law precepts concerning fraudulent misrepresentation, negligent misrepresentation, tortious interference with business expectancies, tortious interference with contractual relationship, and unfair competition. Connecticut's choice of law rules for tort claims require the court to apply the law of the state with the most significant relationship to the occurrence and the parties. *O'Connor v. O'Connor*, 201 Conn. 632, 652, 519 A.2d 13 (1986); *see also Pollack v. Bridgestone/Firestone, Inc.*, 939 F.Supp. 151, 153 (D.Conn.1996). In making this determination, the court considers:

 a) the place where the injury occurred;

 b) the place where the conduct causing the injury occurred;

 c) the residence, place of incorporation and place of business of the parties; and

 d) the place where the relationship, if any between the parties is centered.

*Id.* "The court must also consider the relevant policies and interests of each state involved (citations omitted). These factors 'are to be evaluated according to their relative importance with respect to the particular issue.'" *Pollack v. Bridgestone/Firestone, Inc.*, 939 F.Supp. 151, 153 (D.Conn.1996) (quoting Restatement (Second) Conflicts of Law § 145(2) (1971)).

▮▮▮ Applying the above, the court concludes that the law of India governs the tort claims. The amended complaint alleges that Union Carbide, acting through it subsidiaries, the defendants, UCAP and UCCS, and the defendant Dow, acting through Dow Singapore, orchestrated a scheme to usurp the plaintiffs' business in India and, in this way, injure the plaintiffs in India. The place of injury is therefore India.

With respect to the second consideration, i.e., the place where the conduct causing the injury occurred, the amended complaint fails to point to any one location. In this regard, the amended complaint alleges that Union Carbide of Danbury Connecticut, acting through it's subsidiaries UCAP and UCCS in Singapore, refused to authorize orders for products that had been placed by the plaintiffs, and arbitrarily declined to fill other orders, knowing that such actions would "severely damage[ ][the] plaintiffs' relationships with long term strategic customers." Further, the amended complaint alleges that after the Union Carbide–Dow merger, Dow of Michigan, acting through Dow of India, and Union Carbide, acting directly and through its affiliate co-defendants in Singapore, undermined the plaintiffs' relationships with the plaintiffs' customers through misrepresentation and through modifications to their billing practices, and further induced the plaintiffs, through false statements, to disclose confidential client information for exploitation by Dow. This conduct, as set forth above, presumably occurred in multiple places, including India, Singapore, Michigan, and Connecticut. While the plaintiffs argue in their brief that the tortious conduct emanated

---

**7.** Affidavit of Edward Lam Chung Weng, advocate and solicitor of the Supreme Court of the Republic of Singapore, at ¶ 36.

from Union Carbide's headquarters in Connecticut, the amended complaint does not allege any such conduct as emanating exclusively from, or occurring solely in Connecticut. *See e.g., O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y.1989) (papers in response to a motion to dismiss cannot cure a defect in the pleadings). There is, accordingly, no one place of alleged tortious conduct.

With respect to the third element, i.e., the residence, place of incorporation and place of business of the parties, the weight of the contacts point to Singapore. Although there are significant contacts in the United States generally and, in particular, the Gulf states, the only contact that this case has to Connecticut is that it is the state where Union Carbide is headquartered.

The last element, i.e., the center of the parties' relationship—is India. The purpose of the parties' relationship was the resale of chemical products in India. Moreover, the amended complaint alleges that Dow and Union Carbide conducted business with the plaintiffs through the non-party subsidiary, Dow India, in India, and through defendants UCAP, UCCS, and Dow Singapore for the purpose of generating sales in India. Based on a review of the factors set forth above, and the relevant policies and interests of each state involved, the court concludes that the law of India governs the causes of action arising in common law tort.

2. Tortious Interference with Business Expectancies, Tortious Interference with Contractual Relationships, Unfair Competition, CUTPA, and the Connecticut Antitrust Act.

██ In counts six, seven, and eight, the amended complaint alleges violations of common law precepts concerning tortious interference with business expectancies, tortious interference with contractual relationships, and unfair competition. Because the law of India does not provide a similar basis for relief[8], dismissal is required under Federal Rule of Civil Procedure 12(b)(6). *See e.g., Atlantic Richfield Co. v. Arco–Globus Int'l Co.*, No. 95 Civ. 6361, 1996 WL 742863, *5 (S.D.N.Y.1996) (dismissing common law claim alleging unfair competition because choice of law rules dictated that Russian law apply, and complaint did not articulate a basis for relief under Russian law).

██ Further, in counts nine, ten, eleven, and twelve, the amended complaint alleges violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110b, and the Connecticut Antitrust Act, Conn. Gen.Stat. §§ 35–26 and 35–28(a). Because these causes of action are based upon elements of unfair competition similar to that which is found in the common law of unfair competition, the same choice of law analysis applies to the CUTPA and Connecticut antitrust claims as applies to the tort claims. *See e.g., Emhart Industries, Inc. v. Duracell International, Inc.*, 665 F.Supp. 549, 568 (M.D.Tenn.1987) (applying choice of law analysis applicable to tort claims to CUTPA claim). As the law of India does not authorize an action for unfair trade practices or antitrust, dismissal is required as well for the CUTPA claims and the Connecticut antitrust claim. *See C.A. Westel de Venezuela v. American Telephone and Telegraph Co.*, No. 90 Civ. 6665(PKL), 1992 WL 209641, *13 (S.D.N.Y. Aug.17, 1992) (dismissing state unfair competition claim because the applicable Venezuelan

---

**8.** Affidavit of Som Mandal at ¶¶ 18 and 22. Mandal is a member of the Supreme Court Bar Association of India and the Delhi High Court Bar Association.

law did not recognize that claim); *USGI, Inc. v. Michele Limited Partnership*, No. Civ. B–88–229 (JAC), 1991 WL 152445, *4 (D.Conn. Jan.26, 1991) (a CUTPA claim can be asserted only "when choice of law principles indicated applicability of Connecticut law.").

### 3. Fraudulent Misrepresentation/Non–Disclosure and Negligent Misrepresentation

The defendants next move to dismiss counts four and five of the amended complaint alleging causes of action for fraudulent misrepresentation/non-disclosure and negligent misrepresentation. In counts four and five, the amended complaint alleges that the defendants misrepresented and/or failed to disclose material facts relating to: (a) the plaintiffs' continuing status under the contractual agreements; (b) the actual purpose behind the defendants' desire to obtain the plaintiffs' confidential customer information; and (c) the defendants' plans for distributing products directly to the plaintiffs' customers. The defendants maintain that dismissal of these claims is required because, even if there existed some form of contractual relationship between the parties, that relationship created no special duty requiring disclosure of their allegedly true intentions, and that, in any event, to the extent the plaintiffs relied on any alleged misrepresentation, such reliance was unjustified.

The court concludes that amended complaint fails to state a claim for fraudulent misrepresentation/non-disclosure, but sufficiently alleges a cause of action for negligent misrepresentation. As previously discussed, Connecticut choice of law principles direct that the law of India govern the

tort claims. Indian law recognizes a cause of action for fraudulent and negligent misrepresentation,[9] with the elements of these claims being the same as exist under the common law of this country.[10]

### A. Fraudulent Misrepresentation/Non–Disclosure

■ To prevail on a claim of fraudulent misrepresentation/non-disclosure, the plaintiffs are required to prove: (a) a material misrepresentation or omission for which the party has a duty to disclose; (b) an intent to defraud; (c) reasonable reliance on the representation; and (4) damages as a result. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995). "The key element in a case of fraudulent non-disclosure is that there must be circumstances which impose a duty to speak." *Jackson v. Jackson*, 2 Conn.App. 179, 194, 478 A.2d 1026 (1984). Usually, parties that deal with one another at arms length do not have a duty to explain or disclose to each other their understanding of the terms of a written contract. *Topf v. Warnaco, Inc.*, 942 F.Supp. 762, 769 (D.Conn.1996). In this case, the amended complaint alleges that the "[d]efendants owed a duty to [the][p]laintiffs" but fails to allege any facts indicating that the parties had a special/fiduciary or confidential relationship or that they were dealing with one another other than at arms-length. Accordingly, the court concludes that the defendants were not under a duty to disclose their understanding of the agreements and, therefore, dismissal is required for the claim of fraudulent misrepresentation/non-disclosure.

---

**9.** Affidavit of Som Mandal at ¶ 7. Mandal is a member of the Supreme Court Bar Association of India and the Delhi High Court Bar Association.

**10.** Affidavit of Edward Lam Chung Weng, advocate and solicitor of the Supreme Court of the Republic of Singapore, at ¶¶ 6–8.

### B. Negligent Misrepresentation

To prevail on a claim of negligent misrepresentation, the plaintiffs must prove that, in the course of business, profession, or employment, (a) the defendants supplied false information for the plaintiffs' guidance; (b) that the defendants failed to exercise reasonable care or competence in obtaining or communicating the information; and (c) that the plaintiffs justifiably relied upon the information to their detriment. *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 217–18, 520 A.2d 217 (1987) (citing § 552 of the Restatement (Second) of Torts). Unlike a cause of action for fraudulent misrepresentation/non-disclosure, "no special relationship is required to state a claim of negligent misrepresentation." *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 575, 657 A.2d 212, 221 (Conn.1995).

█ The defendants have argued that the claim of negligent misrepresentation should be dismissed because, as with the claim of fraudulent misrepresentation, the amended complaint fails to allege a special relationship imposing a duty to disclose on the defendants, or justifiable reliance on the part of the plaintiffs. Although the court agrees with the defendants that the amended complaint fails to allege facts supporting a special relationship, no such relationship is required to state a claim for negligent misrepresentation. *See Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 575, 657 A.2d 212, 221 (Conn.1995). Further, because the amended complaint sufficiently alleges that the plaintiffs reasonably relied on the defendants' alleged misrepresentations and omissions, and the reasonableness of that reliance is, in the end, an issue of fact exceeding the scope for dismissal under Fed.R.Civ.P. 12(b)(6), the motion to dismiss count five alleging negligent misrepresentation is denied.

### CONCLUSION

For the foregoing reasons, the motion to dismiss count one of the amended complaint alleging violations of the Sherman Antitrust Act (document no. 81) is DENIED. The motion to dismiss the amended complaint (document no. 78) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to the claim of: (1) breach of the implied covenant of good faith and fair dealing (count three); (2) fraudulent misrepresentation (count four); (3) tortious interference with business expectancies (count six); (4) tortious interference with contractual relationships (count seven); (5) unfair competition (count eight); (6) violations of the Connecticut Unfair Trade Practices Act (counts nine, ten and eleven); and (7) violations of the Connecticut Antitrust Act (count twelve). The motion is DENIED with respect to the claim of: (1) breach of contract; and (2) negligent misrepresentation.