**COUNTRY CLUB ASSOCIATES,**
et al., Plaintiffs,

v.

**SHAW'S SUPERMARKETS,**
**INC., et al., Defendants.**

Civil Action No. 06–cv–0491 (JCH).

United States District Court,
D. Connecticut.

July 28, 2009.

Richard P. Weinstein, Weinstein & Wisser, P.C., West Hartford, CT, for Plaintiff.

Gerald E. Burns, Katie L. Miscioscia, Klett, Rooney, Lieber & Schorling, PC, Philadelphia, PA, Sandra R. Baker, Sharone G. Kornman, Regnier, Taylor, Curran & Eddy, Hartford, CT, for Defendants.

**RULING RE: PLAINTIFF'S MOTION TO ALTER OR AMEND AMENDED JUDGMENT (Doc. No. 176)**

JANET C. HALL, District Judge.

On May 29, 2009, 2009 WL 1537952, this court issued an Amended Bench Trial Rul-

ing and Amended Judgment in this matter. Pending before the court is CCA's Motion to Alter or Amend the Amended Bench Trial Ruling and Amended Judgment (Doc. No. 176). Shaw's has filed an opposition to plaintiffs' Motion. After outlining the standard of review, the court will address plaintiff's objections to the court's judgment. The court presumes familiarity with the factual background and procedural history of this case as outlined in its Amended Bench Trial Ruling (Doc. No. 174).

## I. STANDARD OF REVIEW

A motion to alter or amend a judgment under Rule 59 is decided under the same standard as a motion for reconsideration pursuant to Rule 59. *See Ass'n for Retarded Citizens of Conn., Inc. v. Thorne*, 68 F.3d 547, 553 (2d Cir.1995). The Second Circuit has held that "[t]he standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995) (citations omitted). There are three grounds that justify granting a motion for reconsideration: (1) an intervening change in controlling law; (2) the availability of newly discovered evidence; and (3) the need to correct clear error or prevent manifest in-

justice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992). That the court overlooked controlling law or material facts may also entitle a party to succeed on a motion to reconsider. *Eisemann v. Greene*, 204 F.3d 393, 395 n. 2 (2d Cir.2000) (per curiam).

## II. DISCUSSION

A. *The Award of Damages on Shaw's Counterclaim for Common Area Maintenance, Taxes, and Insurance, and the Role of Section 6.4 of the Shaw's Lease in the Court's Decision*

CCA contends that the court improperly construed payments made by Stop & Shop under Master Lease I for common area maintenance,[1] insurance, and taxes to be "a payment by another tenant of the Center 'in excess of such other tenant's Pro Rata Share' of Common Charge," and thereby owed to Shaw's pursuant to the reconciliation provision of section 6.4 of the Shaw's Lease. Pls.' Mot. at 1. CCA reasons that references in Master Lease I to Stop & Shop's payment of a pro rata share of real estate taxes, common facilities charges, and insurance premiums served only to specify a variable amount by which Stop & Shop's consideration for its reversionary lease was measured and were not intended as actual reimbursement of the itemized charges specified. Therefore, CCA contends, the floating

1. In the leases and various filings, the parties alternately refer to common area maintenance, which encompasses snow and ice removal, gardening and landscaping, trash removal, lighting and parking lot repairs, paving, and the like, as "common area maintenance," "CAM," "common facilities charges," or "charges for common area services." (In sections 3.3 and 17.7 of Master Lease I, the parties also used the term "Common Charges" to refer to these charges).

The court uses these synonyms for "common area maintenance," with the exception of "common charges," interchangeably. The court considers these terms to be distinct from the term "common charges," which the court used in its Amended Ruling to refer to common area maintenance, taxes, and insurance, and which the parties to the Shaw's Lease used to refer to common area maintenance and insurance, but not taxes. The court further discusses its use of the term "common charges," *infra*, at 247.

amount should be treated akin to the "key money fee" (or considered part of that fee) that the court held was properly treated as consideration for Stop & Shop's reversionary lease. CCA also contends that the court's ruling, in effect, improperly awarded Shaw's third-party beneficiary status under the Stop & Shop Leases. Finally, CCA suggests that taxes were not properly treated as part of "common charges" in the court's analysis, since the Shaw's Lease defines "common charges" to include only CAM and insurance.

Shaw's counters that CCA has offered an unduly crabbed interpretation of the court's Ruling, contending that the court did not rest its holding on section 6.4 of the Shaw's Lease alone but also, or even primarily, looked to the covenant of good faith and fair dealing and the intent of the parties as expressed in other sections of the Shaw's Lease. Shaw's notes that the court held that Shaw's had a right to expect that it would not be billed more than a pro rata share of common charges that were also paid by another party, and CCA failed to adhere to its bargain, thereby warranting an award of damages.

The court will first address the role of section 6.4 in its decision. The court turned to section 6.4 only after discussing the covenant of good faith and fair dealing and also section 6.2, the provision of the Shaw's lease that provided for Shaw's to pay a pro rata share of common area services charges. The court reasoned that pursuant to section 6.2 (and implicitly pursuant to the covenant of good faith and fair dealing),

> Shaw's had the right to assume that CCA would bill it only for its pro rata share of the charges, and that CCA would credit Shaw's for any overpayments that resulted in CCA being overpaid for the common charges attributable to the 40,000 square foot space.

Am. Ruling at 53. Only after coming to this conclusion did the court look to section 6.4. *See id.* Looking to that section, the court then reasoned that section 6.2 and 6.4 together expressed,

> the parties' intent that Shaw's would be liable in the first instance for a pro rata share of actual common charges incurred, but that to the extent CCA received reimbursement from another tenant in the Plaza that, in effect, covered a portion of the common charges attributable to the Shaw's premises, then Shaw's would be entitled to reimbursement of that amount.

*Id.* at 54. The court did not hold that Shaw's entitlement to damages stemmed exclusively from a breach of CCA's duty of reconciliation contained within section 6.4. Rather, the court reasoned that the intent of CCA and Shaw's as expressed in section 6.2 and 6.4 of the Shaw's Lease required that CCA not double-bill Shaw's for a share of common charges that were also being reimbursed by Stop & Shop.

Throughout its Amended Ruling, the court employed the term "common charges" to refer to common area maintenance (CAM) charges, taxes, and insurance. *See* Am. Ruling at 4, 52. As CCA points out, however, Article VI of the Shaw's Lease, including section 6.4 of that Lease, uses the same term, "common charges," to refer only to common area maintenance and insurance charges, not taxes. Mem. at 13. Therefore, the court's discussion of section 6.2 and the meaning of "Tenant's pro rata share" should also have referred to sections 5.2, 5.3, 5.4, and 5.6 (as amended), which define the Tenant's pro rata share with regard to real estate taxes imposed on the land and buildings in a similar fashion to the definition in section 6.2 and require Shaw's to pay CCA for its pro rata share of taxes. It should also have referred to section 6.3,

which requires the payment of Tenant's pro rata share of insurance premiums and incorporates the definition of Tenant's pro rata share used in section 6.2. Further, in discussing the reconciliation of common charges required by section 6.4, the court erred in failing to distinguish between the CAM and insurance charges, which the lease described as "common charges" subject to reconciliation, and the payment for taxes, which the lease did not include in the description of "common charges" in section 6.4.

CCA also raises the objection that the exclusion of taxes from the reconciliation provision in section 6.4 must be read as an indication that the parties did not intend any reconciliation obligation with respect to tax payments. Pls.' Reply at 3–4. CCA notes that tax bills can be disputed and resolved only years later, and that the absence of a reconciliation provision could have been intended to avoid a post-lease period in which the parties' obligations to each other would remain uncertain. *Id.* While that eventuality may in fact explain the absence of a reconciliation provision with regard to the tax payments, the absence of such a provision does not mean that CCA did not breach its contract and the implied covenant of good faith and fair dealing by double-billing Shaw's and Stop & Shop for the same pro rata share of taxes attributable to the 40,000 square foot space. The double-billing of taxes, CAM, and insurance premiums would still have violated Shaw's contract even absent section 6.4. Sections 5.2, 5.3, 5.4, 5.6 (as amended), and 6.3, together with section 6.2, express the intent of CCA and Shaw's that Shaw's would be liable only for its pro rata share of CAM, taxes, and insurance charges. At the very least, it would be a violation of the covenant of good faith and

fair dealing for CCA to collect amounts for charges of any of these three types for which Shaw's was responsible under its Lease, but which were nevertheless reimbursed by another party.

Construing sections 5.2, 5.3, 5.4, 5.6, 6.1, 6.2, 6.3 and 6.4 (the last section with regard to CAM and insurance only), under the implied covenant of good faith and fair dealing as Massachusetts law requires, the court concludes that double-billing Shaw's for a share of CAM, taxes, or insurance charges that were also being reimbursed by another party was not "faithful to the intended and agreed expectations of the contract." *Chokel v. Genzyme Corp.*, 449 Mass. 272, 276, 867 N.E.2d 325 (2007) (internal citations and quotation marks omitted). Shaw's therefore remains entitled on its breach of contract claim, as the court concluded, to recover the net amount of excess CAM, taxes, and insurance retained by CCA.

■ The court reaches a similar conclusion as to the fraud and CUTPA[2] claims. The court acknowledges that its analysis of the fraud and CUTPA claims assumed the applicability of the reconciliation provision, section 6.4, to taxes in addition to CAM and insurance. *See* Am. Ruling at 57 ("[Shaw's] share was effectively altered by Stop & Shop's payment of common charges as explained in the court's analysis of the breach of contract claim."); *id.* at 60 ("CCA has violated CUTPA by deliberately concealing that Stop & Shop was also paying common charges on the 40,000 square foot space in order to avoid having to comply with its contractual obligation to reconcile the charges and refund excess monies collected to Shaw's."). However, the non-applicability of section 6.4 to the charges for taxes does not change the fact

**2.** The court will separately address CCA's arguments that its conduct is not actionable

under CUTPA, *infra*, at 252.

that making incomplete disclosures to Shaw's with regard to taxes in addition to the common area maintenance and insurance constitutes fraud and violates CUTPA. Based on CCA's disclosures, Shaw's reasonably assumed that CCA was out-of-pocket for the expenses for which it had billed Shaw's, and that Shaw's was required to reimburse CCA accordingly. Retaining an excess share of the charges by deliberately concealing from Shaw's that another party was also paying those same charges constitutes fraud and violates CUTPA, and entitles Shaw's to recover the net amount of excess CAM, taxes, and insurance retained by CCA.[3]

■ The conclusion that Shaw's is entitled to recover the net amount of excess CAM, taxes, and insurance retained by CCA does not end the analysis, however. CCA makes a forceful argument that the payments pursuant to the Stop & Shop Master Lease I denominated (and invoiced as) CAM, taxes, and insurance were "part of the formula for calculating the consideration for reserving the future right to occupy the space leased to Shaw's, but was not payment for" those charges. Pls.' Mem. at 3–4. In its Amended Ruling, the court held that the fixed sum of "key mon-

ey" paid by Stop & Shop pursuant to section 3.1 of Master Lease I was consideration for the reversionary lease entered into by Stop & Shop and CCA. Therefore, if the payments denominated and invoiced as CAM, taxes, and insurance were not in fact payment for those charges but instead were simply a variable fee for reserving space under Master Lease I, then Shaw's might not be entitled to the damages awarded by the court.

In determining the intent of the parties as to the payments made from Stop & Shop to CCA, the court looked to Master Lease I, which provides in pertinent part as follows:

> *Key Money Fee.* No Rent shall be payable under this lease during the period beginning on the date of this lease and ending on the Commencement Date (the "Interim Period"). In lieu thereof, Tenant shall pay to Landlord during the Interim Period, a key money fee at the rate of $24,166.66 per month for the portion of the Interim Period occurring during the period beginning on February 1, 2000 and ending on January 31, 2005, and at the rate of $25,000.00 per month for the remainder of the Interim

---

3. Section 6.2, which provides the definition of "pro rata share" governing the allocation of common area services and insurance, defines it as "that proportion that the first floor area of the Premises bears to the total first floor area of all buildings in the Center." The provisions governing the pro rata share for the allocation of real estate taxes are similarly worded. *See* Shaw's Lease, sections 5.2 and 5.3. CCA has therefore emphasized that, because its contract with Shaw's permitted it to collect a certain share of common area maintenance, taxes, and insurance attributable to the 40,000 square foot space, collecting these charges from Shaw's in literal compliance with the terms of the Shaw's Lease—regardless of what CCA was paid by other parties pursuant to other contracts—cannot violate Shaw's rights.

The court disagrees. Just because a contract makes one party entitled to be reimbursed by the other party for expenses incurred does not prevent double-collection from being fraud or a breach of that party's contractual obligations, however. An analogy would be to the consultant from New York who takes a trip to Chicago to meet with two different clients. Her contract with each client entitles her to reimbursement for her travel expenses. The contract with client one is similarly worded to the contract with client two, and makes no specific provision for trips involving visits to multiple unrelated clients. Nevertheless, it might still be fraud, and a breach of contract, for the consultant to bill client one for the full amount of her air travel, lodging, and meals, while simultaneously billing client two for the full amount of the same expenses.

Period, together with Tenant's pro rata share of real estate taxes, Common Charges, and fire insurance premiums as provided in Articles IV, XI, and XVII of this lease (collectively, the "Additional Charges"). Said key money fee shall be paid to Landlord at Landlord's address for notices ... Notwithstanding the foregoing, in the event that the Existing Tenant (as defined in Article XX hereof) or any subtenant or occupant shall open for business in the Demised Premises from and after the date of this lease, then (i) no amounts shall be due and payable by Tenant under this Section 3.3, and (ii) no Additional Charges shall be due and payable by Tenant until the Existing Lease has been terminated....

First Amendment to Master Lease I, section 3.3. Section 3.3, entitled "Key Money Fee," makes clear that Stop & Shop's total obligation consisted of paying a fixed amount plus an amount described as "Tenant's pro rata share" of various charges. The court is persuaded that the "key money" paid under section 3.3 was distinct from the pro rata share of real estate taxes, common area maintenance, and insurance premiums. In two separate places, section 3.3 draws a distinction between the "key money fee" payable under this section and the "Additional Charges" payable under Articles IV, XI, and XVII. First, it refers to the requirement to pay "a key money fee at the rate of $24,166.66 ... *together with* Tenant's pro rata share" of Additional Charges. *Id.* (emphasis added). While it is arguable that "key money fee" is meant to include the fixed rate as well as the Tenant's pro rata share of the Additional Charges, it is most natural to read this provision as referring to two separate sets of charges, only the first of which is the "key money fee." Second, the final sentence of the section refers separately to "amounts ... due and payable by Tenant under this Section 3.3," and to "Additional Charges." The only logical

reading of this sentence is that the amounts due under Section 3.3, the "Key Money Fee" section, is the fixed amount referenced in the section, and does not include the Additional Charges.

Nevertheless, even if the "Tenant's pro rata share" of "Additional Charges" is distinct from "key money," it is still possible (though not necessarily plausible) to read the text of Section 3.3 in the way that CCA suggests—that is, as providing for a fixed and variable amount of payment as monthly compensation for reserving the future right to occupy the space leased to Shaw's, measuring the variable amount with reference to the amount of additional charges, but not expressing an intent on the part of the parties that Stop & Shop reimburse CCA for any actual expenses incurred. However, section 3.3 also incorporates Articles IV, XI, and XVII of Master Lease I by reference. These articles, which were not amended by the First Amendment to Master Lease I and therefore exist in the same form as they did when Master Lease I was originally conceived as a possessory lease, provide for the payment of Real Estate Taxes, Insurance, and "Common Facilities Services," respectively. Each of these sections makes clear the parties' intent that CCA would pay the charges attributable to the entire Country Club Plaza with regard to these amounts, and would then be reimbursed by Stop & Shop for the share of these charges attributable to the 40,000 square foot space. With regard to real estate taxes, section 4.1 provides that, "Landlord shall pay Real Estate Taxes ... imposed upon the Shopping Center.... Tenant shall pay Landlord the Real Estate Taxes attributable to the Demised Premises...." Master Lease I, section 4.1. The Lease goes on to define the taxes attributable to the Demised Premises as those assessed directly against the 40,000 square foot space and the fraction of Land Tax attributable to

that space, or if the 40,000 square foot space is not assessed separately, the fraction of taxes assessed on the overall property that is attributable to the 40,000 square foot space. Master Lease I, section 4.2. In section 4.5, Landlord "agrees that all sums paid to it by Tenant for then unpaid real estate taxes shall be received by it in trust." In using the word "attributable," and referencing receipt of sums in "trust," Article IV clearly expresses the intent of the parties that Stop & Shop reimburse CCA for the pro rata share of real estate taxes attributable to the 40,000 square foot space. Similarly, with regard to insurance, section 11.1(a) provides that the Landlord agrees to carry insurance, and that, "Tenant agrees to pay to Landlord, Tenant's share of the annual cost" of that insurance. Article XI's use of the phrase "Tenant's share of the annual cost" expresses the parties' intent that Stop & Shop reimburse CCA for the pro rata share of insurance costs attributable to the 40,000 square foot space. Finally, section 17.7 provides for the Tenant to pay for "Tenant's Pro Rata Share of" Common (Facilities) Charges, "computed by multiplying the whole of said Common Charges for the applicable calendar year by Tenant's Fraction," plus a management fee of 10%. Section 17.8 further provides that the Landlord, upon request, "shall furnish to Tenant photocopies of bills and other relevant material confirming Landlord's statement of Common Charges." The most natural reading of Article VI, as with Articles IV and XI, is that CCA will incur charges, represented by the "bills and other relevant materials," and then Stop &

Shop will pay CCA for its pro rata share of those charges—that is, the pro rata share of common (facilities) charges attributable to the 40,000 square foot space.

As written, Articles IV, XI, and XVII clearly contemplate that as CCA incurs charges for taxes, insurance, and common facilities, it will pass through the pro rata share of such charges—that is, the share of charges attributable to the 40,000 square foot space—to Stop & Shop. The transformation of Master Lease I into a reversionary lease by the First Amendment, particularly section 3.3, does not alter the fact that Master Lease I continued to provide for CCA to bill Stop & Shop for the share of taxes, insurance, and common maintenance attributable to the 40,000 square foot space. Further, the invoices confirm that CCA did in fact invoice Stop & Shop for a pro rata share of these charges, even as it also invoiced Shaw's for a pro rata share of the same charges.[4] CCA and Stop & Shop were free to enter into a reversionary lease and measure the consideration by any means that they wanted. However, just because the parties could do so does not mean that they did so. Notwithstanding the First Amendment, Master Lease I provided for Stop & Shop to reimburse CCA for the pro rata share of taxes, insurance, and common area maintenance attributable to the 40,000 square foot space, even as CCA was receiving reimbursement for that same pro rata share from Shaw's under the terms of the Shaw's Lease. Therefore, under the terms of the Shaw's Lease as construed

---

4. CCA contends that the consolidated invoice format was "for the convenience of Stop & Shop" and should have no bearing on the court's analysis. Pls.' Mem. at 10 n. 5. While the court does not rely on the invoices as a means of interpreting the meaning of Master Lease I, the fact that Stop & Shop was billed in a consolidated fashion for a pro rata share of CAM, insurance, and taxes attributable to the 40,000 square foot space and the 18,000 square foot space (of which it was actually in possession) supports this court's conclusion that Stop & Shop did in fact reimburse CCA for a pro rata share of CAM, insurance, and taxes attributable to the 40,000 square foot space.

*supra* and in the Amended Bench Trial Ruling, Shaw's is entitled, as damages on its breach of contract, fraud, and CUTPA claims, to reimbursement of the net excess charges that it paid for common area maintenance, taxes, and insurance.

### B. *CUTPA*

In its Motion, CCA reiterates its long-standing objection that relief under CUT-PA is unavailable because the lease that is the subject of the counterclaim concerns property situated in Massachusetts. More specifically, CCA raises several objections to the court's reasoning and application of CUTPA to the facts of this case. CCA contends that the court erroneously found that the January 9, 2006 statement involved the transmission of money to Connecticut, when payment was mailed to Florida, not Connecticut. It also contends that the court erroneously found that the claim involved leases prepared in and sent from Connecticut, when there was no such evidence in the record, and further that it was legally erroneous to rely on this fact because the basis for liability was the administration of the lease and the lease explicitly provided that it was governed by Massachusetts law. CCA also contends that the court's general choice of law analysis, which determined that Massachusetts law applied to contract and tort claims, requires that CUTPA not be applied. Finally, CCA contends that because the partnership's place of business was Massachusetts (as the court found), the fact that the partnership was domiciled in Connecticut does not provide a sufficient nexus to Connecticut to warrant the imposition of CUTPA liability.

Shaw's objects that the court has already addressed and rejected CCA's arguments and thus they cannot be relitigated on a Rule 59 Motion. Further, it contends that the Stop & Shop leases were clearly prepared and sent from Connecticut, and because the double billing at issue in the case resulted from these leases, there is a sufficient Connecticut nexus. Finally, Shaw's claims that the fact that payments were transmitted to CCA's agent in Florida is irrelevant because the money ultimately reached CCA in Connecticut.

█ The court will first address whether the choice of law clause, which provides that, "This Lease shall be governed by and construed in accordance with the laws of the state in which the Center is located," Shaw's Lease section 13.9, precludes the application of CUTPA to Shaw's claims. Courts construing similar clauses have come to different conclusions. *Compare Blakeslee Arpaia Chapman, Inc. v. Helmsman Mgmt. Servs., Inc.,* No. 443753, 2002 WL 172670, at *2–3 (Conn.Super.Ct. Jan. 9, 2002) (finding that a choice of law provision almost identical to that employed in the Shaw's Lease was not sufficiently broad to apply to tort claims, including CUTPA claims), and *McKeown Distributors, Inc. v. Gyp–Crete Corp.,* 618 F.Supp. 632, 643 n. 5 (D.Conn.1985) (construing similar choice of law provision in contract to not affect availability of CUTPA claim), *with Corporate Dev. Int'l, Inc. v. Tenneco Packaging, Inc.,* No. CV 980164069, 1998 WL 756736, at *3 (Conn.Super.Ct. Oct. 21, 1998) (determining based on choice of law provision almost identical to that employed in Shaw's Lease that Illinois law applied, and then striking CUTPA claim on that basis). The court finds the reasoning of *Blakeslee,* that the provision should be narrowly construed, persuasive. The choice of law provision does not explicitly encompass tort claims. Particularly given the legislative direction that CUTPA is to be construed broadly, the court concludes that allowing a non-specific choice of law clause of this sort to preclude the operation of CUTPA would violate the public policy of the state. *See, e.g., Custard Ins. Adjusters, Inc. v. Nardi,* No.

CV980061967S, 2000 WL 562318, at *8 (Conn.Super.Ct. Apr. 20, 2000) ("[E]ven if the choice of law provision should be interpreted as providing that Massachusetts law applies to all claims it would violate our state's fundamental policy to give an effect to that provision that would prevent suit under CUTPA...."). The court therefore does not apply the narrow choice of law provision in the Shaw's Lease to preclude the operation of CUTPA.

█ The court turns now to the related question of whether this court's conclusion that Massachusetts law applies to tort claims in this case categorically precludes CUTPA's application. Courts have adopted differing approaches to answering the question of whether CUTPA applies to a multi-state or potentially out-of-state transaction. One approach is to permit a plaintiff seeking to apply CUTPA to such a transaction to make out a CUTPA claim when *either* the violation is "tied to a form of trade or commerce intimately associated with Connecticut," *see* Am. Ruling at 59 (citing cases), or Connecticut choice of law principles are applicable and require the application of Connecticut law. *See Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher–Price, Inc.,* 406 F.Supp.2d 175, 200 (D.Conn.2005), *aff'd in pertinent part on reconsideration,* 409 F.Supp.2d 112 (D.Conn.2006).

An alternative approach is to apply a sister state (or country)'s unfair trade practices law, if any, where the choice of law analysis for tort claims favors application of the sister state's law. For example, in *Abernathy/MacGregor Group, Inc. v. Ellis,* the court determined that New York law applied to the plaintiff's tort claims. No. 303139, 1994 WL 372726, at *7 (Conn.Super.Ct. July 8, 1994). The plaintiff had pled a violation of both CUTPA and the New York Consumer Protection Law. *Id.* Without considering whether CUTPA claims might require a different choice of law analysis than ordinary tort claims, the court applied New York's Consumer Protection Law on the basis that it had determined that New York substantive law applied to the plaintiff's claims. *Id.* Similarly, in *MM Global Services, Inc. v. Dow Chemical Co.,* the court concluded that the law of India applied to tort claims. 283 F.Supp.2d 689, 704–05 (D.Conn.2003). Based on an affidavit of an Indian lawyer, the court found that the law of India did not authorize an action for unfair trade practices, and therefore dismissed the CUTPA claim. *Id.* Finally, in the case of *C.A. Westel De Venezuela v. American Telephone & Telegraph Co.,* the court reasoned that a given jurisdiction, in that case Venezuela, had "the paramount interest in having its own market-regulating laws, if any, apply to competitive activities that occur within its own markets." No. 90 Civ. 6665(PKL), 1992 WL 209641, at *13 (S.D.N.Y. Aug. 17, 2002). Accordingly, the court concluded that the law of Venezuela would apply to the plaintiff's claim for unfair competition. *Id.* Finding that "Venezuela has no law of unfair competition (statutory or otherwise) under which relief could be granted," the court dismissed the claim. *Id.*

This court finds the approach adopted by the court in *Victor G. Reiling Associates*—that a CUTPA claim will lie when either the violation is "tied to a form of trade or commerce intimately associated with Connecticut" or Connecticut choice of law principles are applicable and require the application of Connecticut law—to be persuasive. 406 F.Supp.2d at 200. Connecticut has an interest in regulating unfair trade practices undertaken from the state by a business domiciled in the state, even where the effects of those practices may have their primary impact out of state or a choice of law analysis of a given transaction favors the application of out-of-state law. The partners in CCA chose to locate the domicile of their partnership in

Connecticut, to locate their headquarters in Connecticut, and to utilize Connecticut's federal courts to litigate a contract dispute with a former tenant. With the exception of the final year of the time period at issue in this case, Shaw's and Stop & Shop were billed from and transmitted money to Connecticut. The court found that CCA engaged in a continuing course of fraudulent conduct over a half-decade period, with an annual violation in January of each year at the time that CCA billed Shaw's. The fact that CCA unilaterally changed the identity and location of the management company[5] in the final year of the Shaw's Lease does not undermine the applicability of CUTPA or eliminate the Connecticut nexus to CCA's continuing violation of Shaw's rights. Finally, the fact that the court, in undertaking a choice of law analysis, found that Massachusetts had a more significant relationship to the occurrences at issue in this case does not vitiate Connecticut's interest in regulating the conduct of businesses domiciled in this state, particularly where the conduct itself was linked to Connecticut over a lengthy period of time.

■ Alternatively, even if the link to Connecticut were too tenuous to permit the application of CUTPA, that fact alone would not preclude Shaw's unfair trade practices claim. In contrast to India and Venezuela, and like New York, Massachusetts has an unfair trade practices law, known as Chapter 93A. Mass. Gen. Laws ch. 93A. The provisions of CUTPA and Chapter 93A are "virtually identical," including as applied to the circumstances of this case.[6] See Normand Josef Enters., Inc. v. Conn. National Bank, 230 Conn. 486, 521, 646 A.2d 1289 (1994). Accordingly, even if the court were to conclude that a choice of law analysis mandated the application of Chapter 93A in place of CUTPA, the resulting analysis and outcome would be largely unchanged. See Bailey Employment Sys., Inc. v. Hahn, 655 F.2d 473, 476 (2d Cir.1981) ("In any event, the choice of law should have little practical effect here because the pertinent provisions of the Massachusetts and Connecticut acts are nearly identical.").

As CCA accurately notes, Shaw's has never sought to amend its Counterclaim to plead an unfair trade practices claim under Massachusetts law. However, as cases such as MM Global Services and C.A. Westel De Venezuela make clear, the dispositive question (under their mode of analysis) as to whether an unfair trade practices claim lies is whether the jurisdiction whose law is to be applied has chosen to regulate unfair trade practices. Were CCA's view of the matter correct, then both cases would have stopped their analysis of whether CUTPA applied with the conclusion that choice-of-law analysis favored the application of a different jurisdiction's law. Instead, the court in MM Global Services looked to the law of India, and the court in C.A. Westel De Venezuela looked to the law of Venezuela, to see if they regulated unfair trade practices in a manner similar to Connecticut. See MM Global Servs., 283 F.Supp.2d at 704–05; Westel, 1992 WL 209641, at *13. Only after concluding that those countries did not regulate unfair trade practices in an

---

5. The court is not aware of evidence in the record that the location of the partnership, Country Club Associates, was changed during the duration of the Shaw's Lease.

6. In fact, in some respects, Chapter 93A is more generous to Shaw's position. First, chapter 93A has a four year statute of limitations, as compared with three years for CUT-PA. See Mass. Gen. Laws ch. 260, § 5A; Rita v. Carella, 394 Mass. 822, 826–27, 477 N.E.2d 1016 (1985). Further, the discovery rule applicable to Massachusetts tort claims generally, see Am. Ruling at 63–66, also applies to Chapter 93A claims, in contrast to CUTPA which applies the three-year statute of limitations more strictly, see Am. Ruling at 67.

analogous manner to Connecticut did the courts conclude that an unfair trade practices claim was not viable. Because Massachusetts does regulate trade practices in a manner similar to Connecticut, even if the link to Connecticut were too tenuous to permit the application of CUTPA, the court would apply Chapter 93A rather than dismiss the CUTPA claim entirely. *Cf. Medina v. Liberty Chevrolet,* No. CV040832321S, 2006 WL 829702, at *3 (Conn.Super.Ct. Mar. 15, 2006) (in case where only Chapter 93A claim was pled, concluding based on choice-of-law analysis that Connecticut law applies, and analyzing motion to strike Chapter 93A claim based on CUTPA standards).

▮ Finally, the court notes that this outcome is consistent with the general purposes of choice of law rules: to resolve the question of what state's law applies when multiple states have an interest in having their law apply to a given transaction and there is a conflict between the laws of different states, and to ensure that the law of the state with a paramount interest in having its laws apply to given transaction gets applied. Because Massachusetts and Connecticut both regulate the conduct at issue in this case in similar ways, applying a choice of law analysis that would have the effect of precluding the application of either state's unfair trade practices law would contradict the public policies and legislative intents of both states. To preclude recovery on a proven unfair trade practices claim simply because Shaw's pled a statutory claim under Connecticut law rather than Massachusetts law, when, in the circumstances of this case, the laws are largely the same, would be a throwback to a bygone era of strict pleading requirements.

Because the court finds that the violation is "tied to a form of trade or commerce intimately associated with Connecticut," or alternatively, that Massachusetts law applies and that Shaw's has made out a violation of Chapter 93A, the court adheres to its prior Ruling with regard to Shaw's CUTPA claim.

### C. Prejudgment Interest on Breach of Contract Counterclaim

▮ CCA contends that the court incorrectly interpreted Massachusetts law governing the calculation of prejudgment interest. Specifically, CCA contends that prejudgment interest on the breach of contract counterclaim should run from the date of the commencement of the counterclaim, not the date of the commencement of the action. Shaw's counters that prejudgment interest should run from the date that CCA breached the Shaw's Lease, which Shaw's contends was February 1, 2000. Shaw's further objects that reducing Shaw's award of prejudgment interest would reward CCA's concealment of Shaw's cause of action.

As the court explained in its Amended Ruling, *see* Am. Ruling at 68, on contract claims, Massachusetts law provides for a rate of 12% simple interest calculated from the date of the breach when that date has been established. Mass. Gen. Laws ch. 231, § 6C. Otherwise, interest is computed from the date of the commencement of the "action." *Id.* Upon a review of the caselaw supplied by CCA, the court agrees with CCA that, in the context of a counterclaim, "date of the commencement of the action" means the date of the commencement of the counterclaim. More specifically, it means the date the defendants moved for leave to amend their answer to include a counterclaim, or October 9, 2007. *See Deerskin Trading Post, Inc. v. Spencer Press, Inc.,* 398 Mass. 118, 125–26, 495 N.E.2d 303 (1986).

In its Amended Ruling, the court interpreted the case of *Peabody, N.E., Inc. v. Town of Marshfield,* 426 Mass. 436, 445–46, 689 N.E.2d 774 (1998), to stand for the

proposition that where breaches by multiple parties occurred on multiple dates, even where all dates were ascertainable, prejudgment interest would accrue from the date the action was commenced. *See* Am. Ruling at 69. Taken together, there are several possible ways to apply the holdings of *Deerskin Post* and *Peabody* to the facts of this case.[7] First, the court, as it did initially, could conclude that prejudgment interest on both breach of contract claims runs from the date that CCA commenced its action. Running prejudgment interest from the same date for the claim and counterclaim would perhaps most fairly account for the fact that there were multiple breaches of contract involved in this case across a period of time. As CCA suggests, however, this conclusion would contradict *Deerskin* 's approval of the lower court's conclusion that prejudgment interest on a counterclaim runs from the date the defendants moved for leave to amend their answer to include a counterclaim. 398 Mass. at 125–26, 495 N.E.2d 303. Second, the court could conclude, as Shaw's suggests, that prejudgment interest should run from the date of each party's breach. Those dates are ascertainable; the court has concluded that Shaw's breach took place as of January 31, 2006, and that CCA's breaches took place annually when it billed Shaw's for common area maintenance, taxes, and insurance. *See* Am. Ruling at 68–69. Calculating prejudgment interest from these various dates would be faithful to the statute's direction that prejudgment interest runs from the date of the breach when that date has been established, and only otherwise does it run from the date of the commencement of the action. Mass. Gen. Laws ch. 231, § 6C. Interpreting the statute in this manner, however, would run afoul of *Peabody,* which also involved multiple breaches on ascertainable dates but nevertheless calculated prejudgment interest from the date of the commencement of the action. *See* 426 Mass. at 445, 689 N.E.2d 774 ("Where no demand is made and multiple breaches occur, however, interest must accrue 'from the date of the commencement of the action.' ... In this context the date of breach was not established....."). Third, the court could conclude, as CCA suggests, that in the context of multiple breaches, the court should commence its calculation of prejudgment interest for each party from the date of the commencement of its (respective) action and counterclaim. Doing so would appear to be most faithful to both *Peabody* and *Deerskin.* Shaw's objects that "reducing" the award would "reward" CCA for concealing the action. However, the purpose of an award of prejudgment interest is not to reward or punish parties for deceptive or fraudulent behavior; such concerns are more properly addressed, where permissible, in an award of punitive damages.

Upon reconsideration, the court finds that calculating interest from the date of the commencement of each party's action would most faithfully adhere to the Massachusetts prejudgment interest statute as interpreted by *Peabody* and *Deerskin.*[8]

---

**7.** For purposes of illustration, the court considers when the award of prejudgment interest should start to run with regard to both Shaw's and CCA's claims. The court ultimately concludes that no change in the award of prejudgment interest to CCA would be warranted. However, neither Shaw's nor CCA challenged the award of prejudgment interest to CCA within the time provided by the Federal Rules to file a motion pursuant to Rule 59.

Accordingly, the court would leave that award undisturbed in any case.

**8.** A fourth option would be to run CCA's prejudgment interest from the established date of Shaw's breach of contract, January 31, 2006, and to run Shaw's prejudgment interest from the date of the commencement of the Shaw's counterclaim, because CCA engaged in breaches on multiple dates while

Accordingly, the court will amend its Amended Judgment to reflect that prejudgment interest will run on Shaw's breach of contract counterclaim from October 9, 2007, the date Shaw's filed its Motion for Leave to File Amended Answer and Counterclaim, through the date of its Second Amended Judgment,[9] July 28, 2009.

### D. Prejudgment Interest on Fraud Counterclaim

CCA also challenges the award of prejudgment interest on the fraud counterclaim.[10] The court agrees with CCA, that as with the breach of contract counterclaim, interest on Shaw's fraud claim should run from the commencement of the counterclaim—that is, from when Shaw's filed its Motion for Leave to File its Counterclaim. The court will therefore calculate prejudgment interest to run on the fraud claim from October 9, 2007, through July 28, 2009 (coextensive with the award of prejudgment interest on Count One).

---

Shaw's breach took place only on one date. CCA specifically declines to request such relief, however, and the court will therefore leave its ruling as to the date from which CCA's award of prejudgment interest runs undisturbed. *See* Pls.' Mem. at 24.

**9.** The issuance of a Second Amended Judgment for Shaw's on its counterclaims makes the prior Amended Judgment a nullity as to Shaw's counterclaims, and therefore prejudgment interest is properly calculated on Shaw's claims through the date of the Second Amended Judgment. Because neither CCA nor Shaw's has challenged CCA's judgment, the prior Amended Judgment will remain undisturbed as to CCA's award on its breach of contract claim. Therefore, prejudgment interest as to CCA's claim will continue to run through May 29, 2009, the date of the court's prior Amended Judgment.

**10.** Although CCA challenged the applicability of CUTPA to the facts of this case, the court has not upheld those challenges. CCA did not

### E. Calculation of Prejudgment Interest

Prejudgment interest on Shaw's claims is calculated and awarded as follows:[11]

#### Count One

From December 9, 2007 through July 28, 2009: 12% annually on $405,798.34 for a total of $87,785.85.

#### Count Four

From December 9, 2007 through July 28, 2009: 12% annually on $405,798.34 for a total of $87,785.85 (coextensive with amount on Count One).

#### Count Five

From January 12, 2005 through May 29, 2009: 10% annually on $65,755.69, for a total of $28,788.38, of which $10,773.12 is coextensive with the amounts awarded on Counts One and Four, and of which $18,015.26 is not coextensive with those amounts.

From January 9, 2006 through May 29, 2009: 10% annually on $80,805.12 for a total of $27,363.05, of which $13,238.76 is

---

separately challenge the prejudgment interest calculation on the CUTPA counterclaims, and the court will therefore not disturb its methodology of calculating prejudgment interest on the CUTPA counterclaims. However, because the prejudgment interest awarded on the CUTPA counterclaim was partially co-extensive with prejudgment interest on the breach of contract and fraud counterclaims, and the terms by which the prejudgment interest on those claims is calculated has been altered, the court must recalculate prejudgment interest on the CUTPA counterclaim as well. (Unlike the breach of contract and fraud counterclaims, prejudgment interest on the CUTPA counterclaim will run only through May 29, 2009, the date of the court's prior Amended Judgment).

**11.** Interest has been computed using the Actual/365 method.

coextensive with the amounts awarded on Counts One and Four, and of which $14,124.29 is not coextensive with those amounts.

*Net Amount*

The net amount of prejudgment interest awarded to defendants is $119,925.40.

F. *Limitation of Liability*

██ CCA also requests that the court amend its judgment to give effect to the "Limitation of Landlord Liability" provision in section 16.5 of the Shaw's Lease. Shaw's objects that the issue is not properly before the court at this time, and further objects on the merits that any such limitation would apply only to the breach of contract counterclaim, and not to the fraud or CUTPA claims, including the award of punitive damages and any award of attorneys' fees under CUTPA.

The court declines to resolve this issue. This issue was not previously raised before the court in the pleadings, proposed findings of fact and conclusions of law, or at trial. CCA may be correct that it can raise this issue in resisting efforts to collect on the judgment, but it is not properly before the court at this time.

## III. CONCLUSION

For the foregoing reasons, plaintiff's Motion to Alter or Amend the Amended Bench Trial Ruling and Amended Judgment (Doc. No. 176) is GRANTED IN PART AND DENIED IN PART.[12] The court modifies the previous award of prejudgment interest on defendants' breach of contract (Count One) and fraud (Count Four) counterclaims to run from October 9, 2007, through July 28, 2009 on each claim. In other respects, the court adheres to its prior Amended Ruling (Doc.

No. 174) and Amended Judgment (Doc. No. 175).

A Second Amended Judgment for defendants shall issue. With regard to the counterclaim, judgment will enter for defendants/counterclaim-plaintiffs on Count One in the amount of $405,798.34 plus $87,785.85 prejudgment interest, for a total of $493,584.19; on Count Four in the amount of $405,798.34 plus $87,785.85 prejudgment interest, for a total of $493,584.19 (damages and prejudgment interest both coextensive with amounts on Count One), and on Count Five in the amount of $293,121.62 (including compensatory damages of $146,560.81 coextensive with damages on Count One and Count Four, and punitive damages of $146,560.81), plus prejudgment interest in the amount of $28,788.38 on the January 12, 2005 CUTPA claim, and $27,363.05 on the January 9, 2006 CUTPA claim (of which $10,773.12 for the 1/12/2005 CUTPA claim, and $13,238.76 for the 1/9/2006 CUTPA claim is coextensive with prejudgment interest awarded on Counts One and Four, and of which $18,015.26 for the 1/12/2005 CUTPA claim, and $14,124.29 for the 1/9/2006 CUTPA claim, is not coextensive). Thus, a Second Amended Judgment will enter for defendants in the amount of $552,359.15, plus $119,925.40 prejudgment interest, for a total of $672,284.55.

**SO ORDERED.**

---

12. The court will separately address the parties' pending Motions for Attorneys' Fees at a later date.